## IN THE UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
July 19, 2012

No. 11-20218

Lyle W. Cayce
Clerk

DAMEWARE DEVELOPMENT, L.L.C.; DAMEWARE DEVELOPMENT
L.L.C. DEFINED BENEFIT PENSION PLAN AND TRUST,

Plaintiffs - Appellants,

v.

AMERICAN GENERAL LIFE INSURANCE COMPANY,

Defendant - Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, ELROD, and SOUTHWICK, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Dameware Development, LLC Defined Benefit Pension Plan and Trust
("Dameware" or the "Plan")[1] bought several life insurance policies (the "policies")
from American General Life Insurance Company ("American General"). After
Dameware was unable to obtain the tax benefits it hoped would result from
purchasing the policies, it sued American General for damages and for rescission
of the contract. The district court granted summary judgment to American

---

[1] Dameware Development LLC is a named party to this suit, but the district court
ruled that it did not have standing. Because it does not challenge this contention on appeal,
the only remaining appellant is the Dameware Development, LLC Defined Benefit Pension
Plan and Trust.

No. 11-20218

General. Because we conclude that Dameware has not shown any basis for rescinding the contract nor any contractual duties breached by American General, we AFFIRM the district court's judgment.

## I.

In 2003, Joseph Vizzini, Dameware's financial advisor, attended a presentation about the use of American General financial products to establish a pension plan that qualified for favorable tax treatment pursuant to section 412 of the Internal Revenue Code. On Vizzini's advice, Dameware decided to establish such a plan. Accordingly, Vizzini contacted Kimberly Branch, an American General vice president. Branch referred Vizzini to Alan Zeplain, an American General agent, who, Vizzini says, advised Vizzini that, in order to establish a 412(i) Plan funded by American General's financial products, Dameware must select a Third-Party Administrator ("TPA")[2] from American General's list of approved TPAs. Dameware chose B&F Corporate Benefit Services, Inc. ("B&F"), one of the TPAs that American General had approved. On December 16, 2003, B&F sent Zeplain a proposed 412(I) Plan, and Zeplain forwarded it to Vizzini the next day. Dameware signed an administrative services agreement with B&F on December 23, 2003. Dameware intended to fund the Plan, which came to be known as the Dameware Development, LLC Defined Benefit Pension Plan and Trust, with life insurance policies for three employees and annuities from American General.

---

[2] Vizzini's affidavit explains the role of TPAs as follows:

A key player in putting together a 412(I) plan is the third party administrator (TPA). The TPA develops the plan based on the clients['] objectives, cash flow, and employee census. Annual administration, performed by the TPA, typically includes calculating the required plan contributions, and completing annual reports for the IRS, Department of Labor, and the Pension Benefit Guarantee Corporation, the federal agency that monitors pension plans.

No. 11-20218

On January 13, 2004, Dameware submitted applications for life insurance policies to American General on behalf of three employees: Victoria Goodwin, Karla Hatcher, and Robert K. Hatcher. It paid American General $743,510.47 to fund the Plan for 2003 and partially fund the Plan for 2004 on February 20, 2004, and subsequently paid American General an additional $486,274 to fund the Plan for the remainder of 2004. The three insureds acknowledged receipt of the policies on March 24, 2004. The policies themselves contained no information relating to a 412(I) Plan, except that the applications asserted that one basis for purchasing the policies was "tax benefit." Delivered along with the policies were Disclosure and Acknowledgment Forms. These Disclosure and Acknowledgment Forms included a list of thirteen TPAs, and required the signor to check a box next to the TPA it selected. Each signor selected B&F as TPA. The Disclosure and Acknowledgment Forms contained a number of disclaimers, including the following: that Dameware is not relying on any "representation, warranty or guarantee beyond those contained within the insurance policy contract itself, including any riders or amendments thereto"; that "the TPA indicated herein is responsible for administering the section 412(I) Plan . . ."; and that

> American General Life Insurance Company operates solely in the capacity of a product provider and that any sales presentations, tax consequences, and/or planning concepts that may have been presented by American General Life Insurance Company . . . describing the benefits of using life insurance in connection with the Plan cannot be relied upon as tax or legal advice.

Each Disclosure and Acknowledgment Form was signed on March 24 by Dameware, acting through an agent; the covered Dameware employee; and by Vizzini.

While American General immediately began to provide life insurance coverage for the three covered Dameware employees, Dameware never obtained

No. 11-20218

any tax benefits from the life insurance policies or annuities it purchased from American General.  In July 2005, Vizzini began contacting B&F to learn what information needed to be submitted to receive tax benefits for 2004, but received no response.  Vizzini accordingly contacted American General's Zeplain, who informed Vizzini that American General had terminated its relationship with B&F.   Vizzini and Zeplain thereafter contacted Pension Professionals of America, which American General had also approved as a TPA.  The Pension Professionals of America worked on Dameware's 412(i) Plan for approximately a year.  In April 2006, a representative of Pension Professionals informed Vizzini that B&F's strategy in formulating Dameware's 412(i) Plan had been flawed.  Then, in the summer of 2006, a representative from Pension Professionals of America informed Vizzini that the company was no longer acting as a TPA, and that it had not completed Dameware's 412(i) Plan.

Vizzini contacted Zeplain again, and Zeplain provided the names of two more TPAs.  Vizzini contacted National Pension Associates, one of the two TPAs Zeplain named, and it agreed to do the work.  But it, too, failed to perform the work required to complete a Plan that could be submitted for Dameware's 2006 tax returns.

In December 2006, Dameware advised American General that it no longer wanted to wait to obtain the benefits of a 412(I) Plan.  At this point, it had been three years since Dameware had signed an administrative services agreement with the first TPA, and Dameware had paid more than two million dollars to American General for insurance products.  Dameware asked American General to return the money it had already paid.  American General returned the money Dameware had paid for annuities, but did not return the $1,043,900.83 Dameware had paid in life insurance premiums.  When American General failed to return the life insurance premiums, Dameware sued, alleging that its error

No. 11-20218

concerning a cause for entering into the contract had vitiated its consent, and that American General had breached the contract.

The district court granted summary judgment to American General on Dameware's claims, reasoning that American General had no duties to Dameware with respect to the provision of the TPAs. Dameware appeals.

## II.

The court reviews a decision rendered on a motion for summary judgment de novo, applying the same standard as the district court. *Threadgill v. Prudential Sec. Grp., Inc.*, 145 F.3d 286, 292 (5th Cir. 1998). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the court must view all facts and evidence in the light most favorable to the non-moving party. *United Fire & Cas. Co. v. Hixson Bros.*, 453 F.3d 283, 285 (5th Cir. 2006).

## III.

## A.

We first address Dameware's contention that its contract with American General was invalid. The four elements of a valid contract under Louisiana law are the following: (1) the parties must possess the capacity to contract; (2) the parties' mutual consent must be freely given; (3) there must be a certain object for the contract; and (4) the contract must have a lawful purpose. *St. Charles Ventures, L.L.C. v. Albertsons, Inc.*, 265 F. Supp. 2d 682, 688-90 (E.D. La. 2003) (citing *Provenza v. Cent. & Sw. Servs., Inc.*, 775 So. 2d 84, 89 (La. Ct. App.

No. 11-20218

2000)). At issue here is the requirement that both parties have consented to a contract.[3]

Dameware contends that its consent was vitiated by an error concerning cause. Articles 1949 and 1950 of the Louisiana Civil Code explain what types of error vitiate consent. An error vitiates consent when it "concer[ns] . . a cause without which the obligation would not have been incurred." La. Civ. Code Ann. art. 1949. A "cause" is "the reason why a party obligates himself." *Id.* art. 1967. "Error may concern a cause" when the error

> bears on the nature of the contract, or the thing that is the contractual object or a substantial quality of that thing, or the person or the qualities of the other party, or the law, or any other circumstances that the parties regarded, or should in good faith have regarded, as a cause of that obligation.

*Id.* art. 1950.

Dameware maintains that its cause for entering into the contract was to establish a 412(I) Plan, and that its inability to establish a 412(I) Plan constitutes an error concerning cause. But the contractual language undercuts Dameware's argument. The contract between Dameware and American General focuses almost entirely on American General's provision of life insurance policies. Only one document, the Disclosure and Acknowledgment Form, focuses on the establishment of a 412(I) Plan.[4] The Disclosure and Acknowledgment Form does not demonstrate that the establishment of a 412(I) Plan was Dameware's cause for entering into a contract with American General. As we

---

[3] American General argues that Dameware failed to adequately plead vitiated consent in its complaint and therefore waived arguments based on this theory. We assume without deciding that Dameware has not waived these arguments.

[4] The district court found that the contract was limited to the insurance policies. On appeal, Dameware argues that the Disclosure and Acknowledgment Forms–which were signed on the same day as the insurance policies and which are the only documents connecting American General to the TPAs in any way–were also part of the contract. We assume without deciding that the Disclosure and Acknowledgment Forms were part of the contract.

No. 11-20218

discuss below, the Disclosure and Acknowledgment Form has two primary functions: first, it disclaims any responsibility on the part of American General for establishing a 412(i) Plan; and second, it contains a list of TPAs for Dameware to choose from, and provides that whichever TPA Dameware selects is solely responsible for establishing Dameware's 412(i) Plan.  The relationships between Dameware and the TPAs were governed by contractual agreements separate from the contract between Dameware and American General.  Thus, the cause of the contracts between Dameware and the TPAs—which are not at issue in this case—might have been to establish a 412(I) Plan; but the language of the contract between Dameware and American General demonstrates that "the reason Dameware obligated itself" in its contract with American General was to secure life insurance policies for its employees.[5]

In addition to not squaring with the language of the contract, Dameware's argument does not follow from the language of the Code.  Dameware maintains that it committed an error concerning cause by incorrectly assuming that the establishment of a 412(i) Plan would follow from its purchase of the policies. While the comments to the Louisiana Civil Code provide a number of examples illustrating the application of Article 1950, none of the examples concern factually analogous circumstances.  Comment C, the closest analogy, reads as follows:

> relief may be obtained when either the thing for which a party has contracted or a substantial quality of that thing is different from what he understood at the time of contract, as when, intending to

---

[5] In order to establish that American General owed some duty to Dameware with respect to the 412(I) Plan, Dameware makes much of an affidavit from its financial advisor Joseph Vizzini.  It is well established, though, that courts interpreting contracts may resort to parol evidence only when the contract is ambiguous.  *See, e.g., Carmichael v. Bass P'ship*, Nos. 11-845, 11-669, 2012 WL 280611, at *6 (La. Ct. App. Feb. 1, 2012).  Here, the language of the contract clearly shows that its cause was to exchange premium payments for life insurance coverage, so we are not permitted to consider parol evidence such as Vizzini's affidavit.

buy bars of silver, he has unknowingly bought bars of another
metal, or when, intending to buy a gold vase, he has unknowingly
bought a gold-plated one.

*Id.* art. 1950 cmt. C.  Dameware does not allege that American General's life
insurance policies did not provide life insurance.  It does not even argue that the
policies were inadequate for the purpose of forming 412(I) Plans.  Thus, it does
not argue that the "thing for which [it] contracted or a substantial quality of that
thing is different from what [it] understood at the time of the contract . . . ." *See
id.*  Instead, it blames the TPAs, which are not parties to this action, for failing
to follow the procedures necessary for establishing a 412(I) Plan.[6]  In other
words, Dameware argues that while American General provided the bargained-
for life insurance policies, external events that arose subsequent to contract
formation prevented Dameware from using those policies as it had originally
hoped to.  The language of Article 1950 does not cover such a contention.

Nor does Dameware's argument find support from case law. Dameware
maintains, in essence, that its decision to enter into a contract with American

---

[6]  Notably, Dameware does not argue that American General knew or should have
known that the contract's list of TPAs contained TPAs that were incompetent at the time the
parties entered into the contract, let alone that American General intended to deceive
Dameware when it provided the list of TPAs.  Thus, this case is distinguishable from *The
Board of Trustees of the Ironworkers Local No. 498 Pension Fund v. Nationwide Life Insurance
Co.*, No. 04 C 821, 2005 WL 711977 (N.D. Ill. Mar. 28, 2005) (interpreting Illinois law), relied
upon by Dameware.  In *Local No. 498 Pension Fund*, plaintiffs alleged that the defendants
"acted to deprive them of money, which should have been invested on their behalf, through a
scheme in which Defendants deducted money from fund assets and paid fees, kickbacks, and
commissions to third-party administrators . . ." *Id.* at *1.  Further, plaintiffs alleged that
defendants "willfully concealed" those improper payments.  *Id.* at *8.

While Dameware points to payments from American General to B&F, it does not argue
that these payments were improper, or that American General "willfully concealed" those
payments.  Dameware does argue in a footnote in its brief that, based on a separate lawsuit
American General filed against B&F, American General "must have been aware that B&F was
likely engaging in wrongful behavior related to their duties as Plan Administrators in
February 2005."  The contract at issue here, however, was signed in March 2004, long before
American General filed suit against B&F.

No. 11-20218

General was based on an error concerning whether a future event would occur. But Louisiana law does not contemplate such errors as proper bases for rescission. While mistakes as to the state of the world as it exists at the time of the contract can sometimes constitute errors of cause under Louisiana law, *see Desonier v. Golden Gulf Marine Operators, Inc.*, 474 So.2d at 1316, this logic does not extend to mistaken predictions regarding events that occur after a contract is signed. *See St. Charles Ventures*, 265 F. Supp. 2d at 693 ("[A] claim of error cannot be based on the fact that a party would not have entered into a contact had it anticipated a future event . . . .") (quoting *Shelton v. Congress St. Prop., Inc.*, No. 92-1084, 1993 WL 43637, at *3 (E.D. La. Feb. 16, 1993) (internal quotation marks omitted)); Saul Litvinoff, *Vices of Consent, Error, Fraud, Duress and an Epilogue on Lesion*, 50 La. Law Rev. 1, 28 (1989) ("[T]he general conclusion is that the chance of a future event happening or not is a risk assumed by the party whose expectations will materialize if the event happens or will be frustrated if the event does not happen . . . "). For this reason, Louisiana courts have rejected arguments that post-contract changes in the market prices of contracted-for items constitute error in cause that vitiated consent. *See Hanover Petroleum Corp. v. Tennecco Inc.*, 521 So.2d 1234, 1240-41 (La. Ct. App. 1988).[7]

Accordingly, Dameware's error was not an "error concern[ing] cause" contemplated by the Code. We therefore reject Dameware's argument that its contract with American General should be rescinded.

## B.

We next consider whether American General has breached any duties it owed to Dameware. Under Louisiana law, "[i]nterpretation of a contract is the

---

[7] Regarding the proposition that events occurring after a contract is signed do not provide grounds for rescinding that contract, Louisiana law accords with the common law rule. *See* Restatement (Second) of Contracts § 154 cmt. a.

determination of the common intent of the parties." La. Civ. Code Ann. art. 2045. "Conditions may be expressed either in a stipulation or implied by law, the nature of the contract or the intent of the parties." *Id.* art. 1768.

Dameware argues that the contract demonstrated that Dameware could only choose from the TPAs listed by American General. This restriction, Dameware argues, imposed an obligation on American General to ensure that the TPAs it listed were capable of designing a viable 412(I) Plan. Dameware further contends that its inability to form a Plan within three years shows that American General did not satisfy the condition of ensuring that the TPAs were competent.

The language of the contract demonstrates that American General had no obligation to ensure the TPAs performed competently. The Disclosure and Acknowledgment Form–the only component of the contract that even mentions a 412(I) Plan–specifies the thirteen TPAs that Dameware can choose from to administer its Plan. It creates no duties on the part of American General respecting the establishment of the 412(I) Plan. In fact, three sentences in the Disclosure and Acknowledgment Form specifically disclaim any duties on the part of American General.

First, the Disclosure and Acknowledgment Form asserts the following:

> The Employer and Plan Trustee further acknowledge that they understand that American General Life Insurance Company operates solely in the capacity of a product provider and that any sales presentations, tax consequences and/or planning concepts that may have been presented by American General Life Insurance Company, its employees, agents, representatives and/or other affiliates describing the benefits of using life insurance in connection with the Plan cannot be relied upon as tax or legal advice.

If American General "operates solely in the capacity of a product provider," and the product that it provides is life insurance policies, it follows that the contract

between American General and Dameware does not guarantee that the TPAs hired by Dameware will competently establish a 412(I) Plan.

Second, in the Disclosure and Acknowledgment Form, Dameware disclaims reliance on representations not contained in the policies: "In addition, the Employer and Plan Trustee acknowledge that they are not relying upon any representation, warranty, or guarantee beyond those contained within the insurance policy contract itself, including any riders or amendments thereto." *Id.* Nowhere in the insurance policy contract itself does American General provide any statement that can be construed as a "representation, warranty, or guarantee" concerning a 412(I) Plan. Thus, this language forecloses Dameware's argument that the Disclosure and Acknowledgment Form created a duty on the part of American General to ensure that the TPAs were competent to establish a 412(I) Plan.

Third, the Disclosure and Acknowledgment Form reads that "[t]he Employer and Plan Trustee also hereby acknowledge their understanding that the TPA indicated herein is responsible for administering the section 412(I) plan consistent with the Internal Revenue Code and related Treasury regulations and IRS guidance governing such plans." This language further undercuts Dameware's contention that American General was responsible for ensuring that a viable 412(I) Plan was created by entirely allocating that responsibility to the TPAs.

For these reasons, American General did not breach any duties it owed to Dameware. The contract did not explicitly or implicitly impose a duty on American General to ensure that a 412(I) Plan was formed; in fact, the Disclosure and Acknowledgment Forms expressly provide that such a duty does not exist. Given the extensive disclaimers contained in the Disclosure and Acknowledgment Forms, the contract cannot be read to mean that American

11

No. 11-20218

General guaranteed the performance of the TPAs, nor can it be read as endorsing the advice provided by whichever TPA Dameware chose.

**IV.**

For the foregoing reasons, we AFFIRM the district court's judgment.