Judge HALL dissents in a separate opinion.
POOLER, Circuit Judge:
Louisiana Stadium and Exposition District and the State of Louisiana (together, “LSED”) seek to rescind an agreement to purchase bond insurance from Financial Guaranty Insurance Co. (“FGIC”) and recover its $13 million premium payment. LSED bases its claim on failure of cause, a tenet of Louisiana law that requires all contracts be supported by cause — “the reason why a party obligates himself.” La. Civ.Code Ann. art. 1966, 1967. “Cause” is a broader concept than “consideration,” because cause does not require anything be given in return. Aaron & Turner, L.L.C. v. Perret, 22 So.3d 910, 915 (La.App. 1st Cir.2009). Because we find that the principal cause of the agreement between the parties was the purchase of bond insurance to protect the bondholders in .the event of default, not to reduce the interest rate LSED paid to borrow money, we affirm the district court’s decision.
BACKGROUND
LSED owns the Superdome in New Orleans. FGIC is a stock insurance company *42 with its principal place of business in New York, New York. In 2005, LSED sought to refinance its existing debt to take advantage of lower interest rates. LSED eventually accepted a proposal from Merrill Lynch, Pierce, Fenner & Smith, Inc. (“Merrill Lynch”) to serve as lead underwriter and broker-dealer for the proposed bonds. In March 2006, LSED issued approximately $240 million in auction rate securities (the “Bonds”). Auction rate securities (“ARS”) are long-term, variable rate securities that have their interest rates reset periodically at Dutch auctions. At a Dutch auction, buy orders are filled starting with the lowest rate bid until all the securities offered for sale are matched with purchase orders. The rate at which the final sell order is filled is known as the “clearing rate,” and the clearing rate applies to all outstanding ARS in that issue until the next Dutch auction.
In connection with the Bonds being issued, LSED purchased $13 million in bond insurance from FGIC, purchasing both a Municipal Bond New Insurance Policy and Municipal Bond Debt Service Reserve Fund Policies (together, the “Policies”). LSED alleges that it “understood that its future interest payment savings would be substantially greater than the amount of the premium paid to FGIC.” LSED alleges that it expected that the Policies would “wrap” the Bonds with FGIC’s triple-A credit rating, making the Bonds more attractive to investors.
In 2008 — two years after the bonds were issued — FGIC lost its triple-AAA credit rating after it came to light that FGIC invested in risky credit default swaps and subprime mortgage markets. FGIC eventually was stripped of its credit ratings altogether, and was ordered by the N.Y. Insurance Department to stop writing new policies and to “suspend paying any and all claims” against existing policies.
LSED commenced this action in the U.S. District Court for the Eastern District of Louisiana against FGIC. LSED also sued Merrill Lynch, alleging that Merrill Lynch failed to disclose that the success of the proposed bond structure depended on Merrill Lynch’s submitting support bids in every auction for the thirty-year life of the bonds. LSED’s action eventually was transferred to the Southern District of New York by the Judicial Panel on Multidistrict Litigation along with four other actions. See In re Merrill Lynch & Co., Inc., Auction Rate Sec. (ARS) Mkg. Litig., 626 F.Supp.2d 1331 (J.P.M.L.2009). FGIC moved to dismiss the claims against it for failure to state a cause of action, a motion the district court granted on May 11, 2010. In re Merrill Lynch Auction Rate Sec. Litig., Docket Nos. 09-2030, 09-5404, 09-6770, 2010 WL 1924719, at *14 (S.D.N.Y. May 11, 2010). This appeal followed.[1]
DISCUSSION
We review the grant of a motion to dismiss for failure to state a claim de novo. Harris v. Mills, 572 F.3d 66, 71 (2d Cir.2009). “We consider the legal sufficiency of the complaint, taking its factual allegations to be true and drawing all reasonable inferences in the plaintiffs favor.” Id. We apply a plausibility standard in determining if plaintiff states a complaint for which *43 relief may be granted. Id. at 72. Our plausibility analysis is
guided by two working principles. First, although “a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions,” and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss, and determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.
Id. (internal quotation marks, citations omitted; omission in the original).
The parties agree that Louisiana law governs the analysis. In re Merrill Lynch, 2010 WL 1924719, at *4. Louisiana is a civil law state, and analyzes cases under a different methodology than common law states:
Under Louisiana’s Civil Law tradition, courts look first and foremost to statutory law. The Louisiana Civil Code instructs that ‘[t]he sources of law are legislation and custom,’ and that ‘legislation is a solemn expression of legislative will.’ ‘[T]he primary basis of law for a civilian is legislation, and not (as in the common law) a great body of tradition in the form of prior decisions of the courts.’ The concept of stare decisis is foreign to the Civil Law, including Louisiana. Therefore, in cases such as this we are guided by decisions rendered by the Louisiana appellate courts, particularly when numerous decisions are in accord on a given issue — the so-called jurisprudence constant — but we are not strictly bound by them.
Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co., 953 F.2d 985, 988 (5th Cir.1992) (footnote omitted).
I. Failure of cause.
The primary issue on this appeal is whether LSED may rescind the bond insurance policy for failure of cause. Louisiana’s Civil Code requires that all contracts be supported by cause — “the reason why a party obligates himself.” La. Civ. Code Ann. art. 1966, 1967. “Cause” is a more expansive concept than consideration, because:
[ujnlike the common law analysis of a contract using consideration, which requires something in exchange, the civil law concept of ‘cause’ can obligate a person by his will only. The difference has been analogized to a civilian contract-consent approach compared to a common law contract-bargain approach. Consideration is an objective element required to form a contract, whereas cause is a more subjective element that goes to the intentions of the parties. Therefore, in Louisiana law, a person can be obligated by both a gratuitous or onerous contract.
Aaron & Turner, L.L. C. v. Perret, 22 So.3d 910, 915 (La.App. 1st Cir.2009).
Louisiana law recognizes at least two grounds for failure of cause. “Error can vitiate consent, so that a contract may be rescinded based upon an error.” Cyprien v. Bd. of Supervisors ex rel. Univ. of La., 5 So.3d 862, 868 (La.2009). But “[e]rror vitiates consent only when it concerns a cause without which the obligation would not have been incurred, and that cause was known or should have been known to the other party.” La. Civ.Code art. 1949. Cause may also fail when circumstances change, even if the changes are created by the acts of third parties. Carpenter v. Williams, 428 So.2d 1314, 1318 (La.App. *44 3d Cir.1983) (“[t]he parties entered into a contract assuming certain facts or conditions to exist. When the assumed fact or condition was found not to exist or did not come into existence even through the act of third parties [ ], the contracts have been rescinded.”). Thus, under Louisiana law, a failure of cause that occurs after an agreement is entered into provides a basis for rescission, so long as that cause was known to the other party.
While “[clause is the reason why a party obligates” itself, St. Charles Ventures, LLC v. Albertsons, Inc., 265 F.Supp.2d 682, 687 (E.D.La.2003), a party may also have “motive” to enter into an agreement. “Motive relates to a party’s internal, subjective reasons for entering a contract, which cannot be imputed to the knowledge of the other party.” Bluebonnet Hotel Venture LLC v. Wachovia Bank, N.A., No. 10-cv-489 (E.D.La. Sept. 29, 2011). Unlike cause, an error as to a party’s motive does not provide a ground for rescission of an agreement. St. Charles Ventures, 265 F.Supp.2d at 692 (collecting cases discussing actionable cause and inactionable motive). A failure of cause is therefore a viable ground for rescission, but a failure of motive is not.
Cyprien is particularly instructive on the issue.of failure of cause. There, plaintiff applied for a job as head coach of the University of Louisiana at Lafayette (“ULL”) basketball team. Cyprien, 5 So.3d at 864. Plaintiff had a student worker at his former university fax a copy of plaintiffs resume to ULL. Id. According to the resume, plaintiff had graduated from the University of Texas at San Antonio (“UTSA”) with a bachelor’s degree, which was false. Id. After ULL hired plaintiff, a newspaper revealed that plaintiff never graduated from UTSA. Id. ULL fired plaintiff the same day the article appeared, and plaintiff sued for breach of contract. Id.
The Louisiana Supreme Court determined that ULL properly rescinded the contract based on failure of cause. Id. at 867-68. After considering affidavits from university officials stating that (1) a degree from an accredited four-year university was a job requirement; and (2) ULL would not have hired Cyprien if it knew he did not have a degree from UTSA, the court granted summary judgment to the university, finding:
These affidavits establish that ULL would not have incurred the obligation if it had known that Mr. Cyprien did not have a degree from an accredited university. Mr. Cyprien clearly knew or should have known that his academic qualifications were an important factor in ULL’s decision to hire him. Under these circumstances, we find ULL has established that it had a valid ground to rescind Mr. Cyprien’s contract based on error in the cause. Thus, Mr. Cyprien will be unable to establish a bad faith breach of contract claim. The district court erred in denying ULL’s motion for summary judgment on this claim.
5 So.3d at 868.
Finally, the error in cause must be reasonable to support a claim under Louisiana law. See Quality Design and Constr., Inc. v. Capital Glass Co., 2008 WL 4764341, at *4 (La.App. 1st Cir. Oct. 31, 2008) (“unilateral error ... does not vitiate consent if the reason for the error was the complaining party’s own inexcusable neglect in discovery of the error”); Degravelles v. Hampton, 652 So.2d 647, 649 (La.App. 1st Cir.1995) (“[a] contract may be invalidated for unilateral error as to a fact which was a principal cause for making the contract, but only when the other party knew or should have known it was a principal cause”).
*45 LSED argues that at the time it purchased the bond insurance, FGIC falsely represented that it invested conservatively, was creditworthy, and would take steps to maintain its creditworthiness going forward, and that the district court erred in finding this did not provide it with a viable cause of action under Louisiana law. We agree with the district court’s analysis.
The commitment letters entered into between the parties referenced the “Official Statement Disclosure Language,” which LSED was required to include in the Bonds. The disclosure language stated that FGIC’s triple-A ratings reflected the “ratings agencies’ current assessments of the insurance financial strength ■ of [FGIC].... These ratings are not recommendations to buy, sell or hold the Insured Bonds, and are subject to revision or withdrawal at any time by the rating agencies.” The disclosure language also explicitly stated that the Policies did “not insure any risk other than Nonpayment by the Issuer.” Plainly, LSED was aware that (1) there were no guarantees attached to FGIC’s credit rating over the life of the Bonds and (2) the Bonds’ only intended purpose was to insure the bondholders against the risk of nonpayment by LSED.
This case turns on what LSED purchased from FGIC. As the disclosure language makes clear, LSED purchased bond insurance, not credit enhancement. The distinction is critical. LSED argues that the failure of cause was not FGIC’s inability to maintain a guaranteed triple-A rating, but FGIC’s failure to operate its business in a careful and prudent manner. The problem with LSED’s argument is that it cannot sue based on a failure to pay out on the bonds, because it is undisputed that no bonds were ever presented for payment. Even if a failure to pay occurred, it is not clear that LSED would have standing to press that claim, which would appear to belong to the bondholders in the first instance. That leaves lack of credit enhancement as LSED’s only harm, and while credit enhancement may have been a hoped for benefit of the bonds, it cannot be said to be their primary cause.
LSED’s failure to receive the hoped-for credit enhancement is a failure of motive, not a failure of' cause. Indeed, every court to have considered the issue has found that absent an express contractual obligation, bond insurance policies cannot form the basis for a claim based on an insurer’s ruined credit rating. See Ambac Assurance Corp. v. Adelanto Pub. Util. Auth., No. 09 Civ. 5087(JFK), 2011 WL 5553444, at *6 (S.D.N.Y. Nov. 14, 2011) (“Regardless of the Authority’s subjective motivations for purchasing the insurance policies offered by Ambac, Ambac never assumed a contractual duty to maintain a certain credit rating or to engage in any conduct other than to make the promised payments pursuant to the Bond Insurance Policies and the Surety Bond.”); Water Works Bd. of City of Birmingham v. Ambac Fin. Group, Inc., 718 F.Supp.2d 1317, 1320 (N.D.Ala.2010) (“It would defy logic and common sense for Ambac to obligate itself to maintain for thirty-five (35) years the highest possible credit rating, when the determination and the award of credit ratings are by separate entities”); NPS, LLC v. Ambac Assur. Corp., 706 F.Supp.2d 162, 177 (D.Mass.2010) (“characterizing [lower interest rates] as a ‘principal’ purpose of the Agreement runs counter to the contractual document itself as well as to the nature of the contractual relationship between the parties”); see also Transcript of Oral Argument at 41, City of New Orleans v. Ambac Assurance Corp. (E.D.La. Oct. 14, 2010) 08-3949 (applying Louisiana law to find that “here obtaining the credit enhancement that *46 came with AAC’s financial guarantee was the advantage of entering into the Agreement but characterizing the receipt of these benefits as a principal purpose of the Agreement runs counter to the contractual document itself which does not guarantee credit enhancement over the period of time”).
The Fifth Circuit’s recent decision in Dameware Development, L.L.C. v. American General Life Insurance Co., 688 F.3d 203 (5th Cir.2012), illustrates these concepts. There, a pension plan purchased life insurance policies, then sued the insurance company after the purchase failed to yield the tax benefits the pension plan had hoped for. Specifically, the pension plan intended to use the insurance policies “to establish a pension plan that qualified for favorable tax treatment pursuant to section 412 of the Internal Revenue Code.” Id. at 205. The pension plan argued, in part, that its contract with the insurance company was rendered invalid by an error concerning cause. Id. at 207. The Fifth Circuit, applying Louisiana law, turned to the language of the contract at issue in finding there was no error of cause. It noted that the agreements between the parties “disclaim[] any responsibility on the part of the” insurer for creating a 412(1) Plan; and also contained a list of providers who could create such a plan, and that whichever provided chosen by the pension plan would be “solely responsible” for establishing a 412(1) Plan. Id. Thus, the Fifth Circuit concluded, the language of the agreement between the pension plan and the insurer “demonstrates that ‘the reason [the pension plan] obligated itself in its contract with [the insurer] was to secure life insurance policies for its employees.” Id. Similarly, here the agreements make clear that (1) LSED was purchasing bond insurance, and nothing more; and (2) FGIC made no representations or promises to maintain its credit rating over the life of the bonds.
We find nothing in Louisiana law that would allow a party to recover damages based on a belief that certain conditions would be maintained by the other party when the contract explicitly disclaimed any guarantee of a continuance of those conditions. The underlying transaction here is similar to buying title insurance when obtaining a mortgage to buy a house. The mortgagor buys a title insurance policy that provides coverage to the bank as mortgagee. The fact the mortgagor pays a lower interest rate, or even that the title insurance entices the bank to make the loan, is the benefit the mortgagor receives from purchasing the policy. But the purpose of the policy itself is to provide the bank with insurance in case title turns out to be flawed. The contract is fulfilled when the premium is paid and the insurer agrees to pay if the title is later found flawed. The only breach is if the insurer refuses to pay in accordance with the terms of the policy.
On a much grander scale, that is what happened here. LSED bought bond insurance from FGIC. The purpose of buying the bond insurance was to protect the bondholders in event of a default by LSED. A side benefit may have been a lower interest rate — credit enhancement— but it was not part of the contract. The contract is explicit that it protects only the bondholders, and that there is no guarantee that FGIC will maintain any particular credit rating.
Further, there is a line of Louisiana cases indicating that a party’s “error in judgment founded upon its own evaluation of future market conditions” does not permit rescission based on an error of cause. Hanover Petroleum Corp. v. Tenneco Inc., 521 So.2d 1234, 1240 (La.App. 3d Cir.1988). In Hanover, defendant sought *47 to rescind a contract on the ground of error of cause — specifically “the unforeseen collapse of the natural gas market and governmental restructuring of the industry,” which “rendered its performance under the contract untenable.” Id. The state court refused, finding defendant’s claim of error was simply based on its own error in judgment. Id.; see also Esplanade Oil & Gas Inc. v. Templeton Energy Income Corp., 889 F.2d 621, 625 (5th Cir.1989) (rejecting the assertion that the principal cause of the agreement was to obtain an “income stream,” which had failed as a result of the plunge in the market price of oil and noting that the contract language did not provide for the purchase of an income stream); Superior Oil Co. v. Transco Energy Co., 616 F.Supp. 98, 109 (W.D.La.1985) (holding that the fact that the “market has simply not evolved in the manner anticipated” is not error in the principal cause of the contract).
The facts here are similar. LSED argues that had it known FGIC would act to denigrate its own credit rating, it would never have paid the $13 million premium up front. However, as detailed above, the commitment letters specifically disclaimed any guarantee to maintain a AAA-credit rating agency. This explicit disclaimer language — of which LSED was well aware — placed LSED on notice of the possibility that FGIC’s credit rating would be reduced in the future. LSED took a calculated commercial risk that did not perform as it hoped. Even under Louisiana’s civil law, it is not the role of this court to relieve LSED of its bad bargain.
II. Implied breach of contract.
For the same reasons, LSED fails to state a viable claim for a breach of an implied obligation. Article 2054 of Louisiana’s Civil Code provides:
When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.
By its very nature, Article 2054 is a gapfiller, used to infer obligations into a contract only “[w]hen the parties made no provision for a particular situation.” No such gapfiller is necessary here. The one obligation FGIC assumed was the obligation to pay on the bonds in the event of a default by LSED. In the absence of a default, that obligation does not come due. Moreover, the failure to pay on a properly presented bond would be a breach of an explicit obligation, not an implied obligation.
The Third Amended Complaint cannot be fairly read as creating an issue as to whether “the need to maintain a credit rating of any kind” was an implied contractual obligation. LSED pleaded that “to fulfill its obligation to provide credit enhancement, FGIC needed to issue LSED an insurance policy ... and maintain its ‘triple-A’ rating over the 30-year life of the Bonds.” See A290, ¶293; see also A153, ¶ 78 (“[i]f FGIC’s credit rating fell below triple-A at any time after the Bonds were issued, LSED — not investors holding the Bonds — would bear the cost in the form of higher interest rates”); A230, ¶ 294 (“LSED was paying for FGIC’s triple-A rating”); id. at ¶296 (“FGIC knew that LSED was relying on FGIC’s credit enhancement — accomplished through FGIC’s maintaining its ‘triple-A’ rating ... for the life of the Bonds”); A231, ¶297 (“FGIC’s loss of its ‘triple-A’ rating ...”). While LSED argues that “[t]his case is not simply about FGIC’s credit rating,” that argument loses its force when one reads the pleadings. The pleadings identify FGIC’s *48 breach as the loss of “its ‘triple-A’ credit rating.” The Commitment Letters explicitly disclaim any obligation to maintain a credit rating, and no reading of Louisiana law allows us to imply into a contract an obligation that the parties explicitly rejected.
III. Anticipatory breach of contract.
LSED also argues that FGIC anticipatorily breached its contract by rendering itself unable to pay claims. Under Louisiana law, the doctrine of anticipatory breach “applies when an obligor announces he will not perform an obligation which is due sometime in the future. The obligee need not wait until the obligor fails to perform for the contract to be considered in breach.” Gulf Coast Bank & Trust Co. v. Rick Granger Enters., 800 So.2d 402, 404-05 (La.App. 3d Cir.2001) (quotation marks and citation omitted). Here, LSED argues FGIC explicitly agreed to guarantee payment. But by order of the N.Y. Insurance Department, FGIC cannot pay claims. Thus, LSED argues, FGIC is in breach of contract.
FGIC counters that LSED lacks standing to press this claim, because LSED is not a bondholder. The contract between the parties required only that FGIC issue the policies, and once FGIC did, it argues, all of its obligations to LSED ended. Any future obligations are only to the bondholders, not LSED. See A349, “As used herein, the term ‘Bondholder’ means, as to a particular Bond, the person other than the Issuer who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof.” Thus, because LSED’s rights are not affected by any breach of the Policies, either now or in the future, FGIC argues it cannot be found to have anticipatorily breached the policies.
The district court declined to reach the issue of whether LSED had standing, instead finding that because FGIC did not yet expressly renounce its obligations under the contract, there is no anticipatory breach. We agree. Louisiana law requires “a definitive refusal to perform” before a claim for anticipatory breach can stand. Andrew Dev. Corp. v. West Esplanade Corp., 347 So.2d 210, 213 (La.1977). While FGIC cannot now pay out on any claims because of the Insurance Department order, as made clear at oral argument, that does not mean it could not pay out on such claims in the future. The district court correctly dismissed the breach of contract claim.
IV. Detrimental reliance.
The Louisiana Code permits a party to state a claim for detrimental reliance:
A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee’s reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.
La. Civ.Code Ann. art. 1967. A plaintiff alleging detrimental reliance must establish (1) a representation by conduct or word, (2) justifiable reliance on the representation, and (3) a detrimental change in position because of the reliance. Babkow v. Morris Bart, P.L.C., 726 So.2d 423, 427 (La.App. 4th Cir.1998). The district court found that “[t]he clarity with which the Commitment Letters disclosed that FGIC’s credit rating was subject to change compels the conclusion that LSED cannot benefit from the theory of detrimental reliance.” In re Merrill Lynch, 2010 WL 1924719, at *14.
*49 The district court relied on Drs. Bethea, Moustoukas and Weaver LLC v. St. Paul Guardian Ins. Co., 376 F.3d 399 (5th Cir.2004). Plaintiffs were former policyholders of a medical malpractice policy that provided for free tail coverage for any policyholder who retired. The insurer decided to leave the medical malpractice market. Plaintiffs sued, alleging that the insurer reneged on its promise to provide free tail coverage upon retirement by leaving the market before the plaintiffs retired. Id. at 402. Plaintiffs relied on a letter explaining changes to the policy, and on a brochure, to support their position. The insurer argued that the policy was clear that free tail coverage would be provided under certain limited circumstances (the relevant one here being retirement during the policy’s coverage period), making any reliance on extra-contractual promises unreasonable. Id. The Fifth Circuit held that Louisiana law allows courts to find a plaintiffs reliance on a promise unreasonable as a matter of law where the contract at issue is unambiguous. Id. at 403-04. The Fifth Circuit held that:
We find no error in the district court’s dismissal. Bethea’s allegation of reasonable reliance on the O’Brien letter and St. Paul’s brochures as a promise that St. Paul would provide unconditional free tail coverage, or at least that St. Paul would renew Bethea’s policy until the doctors could take advantage of the free tail coverage, is belied by the clarity of the insurance policy and the content of the documents at issue. The insurance policy, which is indisputably valid and not breached, provides that either party may non-renew at any time and that tail coverage will be provided for no additional premium only upon retirement during the policy’s term. Both the contract’s integration clause and Louisiana law require that any change to the policy be in written form and incorporated into the policy. One could not reasonably rely on a renewal letter explaining policy changes and marketing brochures as a promise to provide free tail coverage without limit, especially considering that such a promise is not mentioned in the documents and would directly conflict with the policy. Given that the insurance policy unambiguously defines the parties’ rights and limits the way to alter the policy, it was unreasonable to rely on informal documents as modifying material aspects of the policy.
Id. at 404-05 (footnote omitted).
LSED argues that the Commitment Letters do not reflect a complete and unambiguous agreement because certain terms (including the pricing) were not included in the contract. Further, LSED argues, the contract here does not include an integration clause, while the contract in Bethea did, again making it distinguishable. FGIC argues that detrimental reliance usually only comes into play when there is no written contract, or when the contract is unenforceable. Jackson v. Lare, 779 So.2d 808, 814 n. 1 (La.App. 2d Cir.2002).
The district court correctly concluded the contract at issue here was unambiguous. The issue of the missing integration clause is not particularly relevant to our analysis. The integration clause was important in Bethea because the plaintiffs were arguing other documents changed the terms of the insurance policy. Under Louisiana law, “[p]arol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless the written expression of the common intention of the parties is ambiguous.” Campbell v. Melton, 817 So.2d 69, 75 (La.2002). “A contract is considered ambiguous on the issue of intent when either it lacks a provision bearing on that issue, the *50 terms of a written contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed.” Id. Looking at the term at issue, the Commitment Letters are plainly unambiguous on the issue before us. The Commitment Letters make clear that FGIC did not guarantee that it would remain a triple-A rated entity for the life of the Bonds. Because the Letters are unambiguous and clear on this point, any reliance on statements made in FGIC’s marketing materials (which were not part of the agreement between the parties) is, as a matter of law, unreasonable.
CONCLUSION
We have examined the remainder of LSED’s arguments and find them to be without merit for the reasons set forth in the district court’s carefully considered opinion. The decision of the district court is affirmed in all respects.

. FGIC is currently operating under an Order of Rehabilitation, issued by the Supreme Court of the State of New York on June 28, 2012, available at http://www.fgicrehabi litation.com/pdflib/FGIC_Order_of_ Rehabilitation.pdf. Both parties, in supplemental briefing, asserted that the order did not bar this Court from issuing a decision because the appeal was fully submitted and argued before the Rehabilitation Order issued. We agree.