# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-30532

NEW ORLEANS CITY,

      Plaintiff - Appellant

v.

AMBAC ASSURANCE CORPORATION; AMBAC FINANCIAL SERVICES, L.L.C.,

      Defendants - Appellees

United States Court of Appeals
Fifth Circuit

**FILED**

March 2, 2016

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Eastern District of Louisiana

Before CLEMENT and HAYNES, Circuit Judges, and GARCIA MARMOLEJO, District Judge.[*]

EDITH BROWN CLEMENT, Circuit Judge:

To help fund a pension plan for firefighters, the City of New Orleans ("the City") decided to issue municipal bonds in December 2000. City officials enlisted the help of an accounting firm, three law firms, and a financial advisory firm to consult in the bond issuance. At the time, the City's credit rating was just above "junk" status.[1] The City contracted with Ambac

---

[*] District Judge of the Southern District of Texas, sitting by designation.

[1] Moody's and Standard and Poor's ("S&P") gave the City an unenhanced credit rating of Baa3 and BBB, respectively.

No. 15-30532

Assurance Corporation ("Ambac")[2] to provide municipal bond insurance. The City paid Ambac a nonrefundable, up-front premium of $6,388,658.80 for the Municipal Bond Insurance Policy (the "Policy"). Under the Policy, Ambac guaranteed payment of principal and interest to the bondholders in the event of non-payment by the City. When the Policy was issued, Ambac enjoyed a Aaa credit rating from Moody's. Accordingly, potential investors viewed the City's bonds as less risky because they were guaranteed by an insurer with the highest possible credit rating.[3]

Starting in late 2007, securities analysts and market commentators began to question the exposure of bond insurers to sub-prime residential mortgage backed securities and similar consumer finance asset-backed securities. As a result, Ambac's credit rating began to fall. As Ambac's credit rating fell, so too did the rating of the City's bonds, despite not missing a payment to the bondholders. The bonds became costlier for the City to service, and Paine Webber eventually stopped remarketing them. Consequently, the

---

[2] Ambac Financial Services, LLC, a wholly-owned affiliate of Ambac, also played a role in this bond deal. For simplicity, Ambac Assurance Corporation and Ambac Financial Services, LLC will be referred to as "Ambac."

[3] The City chose a structure for its bonds that was extremely complex and out-of-the-ordinary. Instead of issuing fixed rate bonds, the City issued approximately $171,000,000 of variable rate debt obligations ("VRDOs"). The VRDOs' rate would fluctuate each week to reflect the prevailing interest rate. This structure required weekly remarketing of the bonds, a job Paine Webber performed for the City pursuant to the Remarketing Agreement. The City also entered into the Standby Bond Purchase Agreement with a predecessor-in-interest of JP Morgan Chase, so that Paine Webber could put the bonds to a liquidity facility in the event of a remarketing failure. To avoid the uncertainty of a floating interest rate, the City entered into an Interest Rate Swap Agreement (the "Swap") with Paine Webber. Under the agreement, the City agreed to pay a fixed rate while Paine Webber paid the variable rate. Ambac also wrote a pair of surety bonds that guaranteed payment by both sides of the Swap. Further complicating matters, Ambac also entered into a separate swap agreement with Paine Webber, whereby Paine Webber agreed to swap to Ambac its exposure on the variable rate that Paine Webber had agreed to pay under the Swap with the City.

No. 15-30532

City has paid tens of millions of dollars in additional debt service and refinancing costs.

On July 17, 2008, the City sued Ambac and other defendants in the United States District Court for the Eastern District of Louisiana. Later, the City filed a second amended complaint asserting numerous claims and seeking money damages. Among the claims against Ambac, the City alleged that Ambac breached an agreement to provide a credit enhancement, that there was error in the principal cause, that Ambac acted in bad faith, and that the City had detrimentally relied on Ambac's representations and assurances regarding the value of its credit enhancement product. In 2010, Ambac filed a motion to dismiss, which the district court granted on all claims against it. Following entry of the final judgment on May 20, 2015, the City appealed.

I.

We review a district court's order on a motion to dismiss for failure to state a claim under Rule 12(b)(6) de novo. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). We accept "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Id.* (internal quotation marks omitted). In order to survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citation omitted).

Here, we may consider the terms of the Policy in assessing the motion to dismiss because Ambac attached it to its motion to dismiss, it was referred to in the complaints, and it is central to the City's claims. *See In re Katrina*, 495 F.3d at 205.

No. 15-30532

II.

A.

First, the City argues that the district court erred by dismissing its breach of contract claim, ignoring Louisiana law which provides that a contract can be comprised of multiple oral and written agreements. The City contends that Ambac agreed to provide credit enhancement, thereby obligating it to use diligence and reasonable care in its underwriting standards—which, in turn, would preserve its high credit rating. And this credit enhancement agreement was recognized in the Policy, the City's resolutions—which Ambac helped draft—and other oral and written agreements. According to the City, Ambac breached its credit enhancement agreement by mismanaging its business and increasing its exposure to the high-risk structured finance credit enhancement business. The City maintains that the existence of this larger credit enhancement contract is ultimately a fact issue, not a question of law for the district court. Therefore, the district court erred when it determined that a larger credit enhancement contract did not exist.

Federal law dictates whether the contract interpretation here is a question of law or fact, and generally, interpreting a contract is a matter of law for the court. *See Cunningham & Co. v. Consol. Realty Mgmt., Inc.,* 803 F.2d 840, 842 (5th Cir. 1986). The district court's interpretation of the Policy to determine that no larger credit enhancement agreement existed was appropriate. Relying on the lack of any written amendment to the Policy memorializing the purported larger credit enhancement and on Louisiana statutory law—providing that the insurance policy governs the obligations of an insurer and those obligations cannot be expanded absent a written amendment attached to a policy—the district court dismissed the City's breach of contract claim. *See* La. Stat. Ann. § 22:867. Without a written amendment attached to the Policy recognizing the existence of a larger credit enhancement

4

agreement, the Policy offers the City no support for its argument. The Policy states only that Ambac guarantees payment of principal and interest to the bondholders in the event of non-payment by the City. It makes no mention of a larger credit enhancement agreement. Additionally, the City's contention that its $6,388,658.80 premium payment to Ambac encompassed compensation for the larger credit enhancement agreement is contradicted by the clear language in the Policy.[4]

The City must plead sufficient facts to make a plausible claim for relief. *Twombly*, 550 U.S. at 570. The City fails to meet this burden. The City argues that the other agreements in conjunction with the bond issuance establish the existence of a larger credit enhancement agreement. But Ambac was only a party to the Policy and the surety bonds for the Swap. None of these agreements mention the supposed credit enhancement obligation. Further, the City's reliance on the resolutions is insufficient. In the resolutions, the City acknowledged that the Policy was a "credit enhancement device[]," but such acknowledgment provides no support for the existence of a larger agreement that required Ambac to maintain certain underwriting standards during the entire term of the bonds. The City purchased bond insurance, and that is what it got.[5] The City's hope that Ambac would remain financially strong and would continue to provide credit support for its bonds does not amount to a legal

---

[4] The Policy states that "the insurance premium of $6,388,658.80 was determined in arm's length negotiations in accordance with our standard procedures, is required to be paid as a condition to the issuance of the Insurance Policy and represents a reasonable charge for the transfer of credit risk." The Policy then states that "no portion of such premium represents a payment for any direct or indirect services other than the transfer of credit risk."

[5] *See La. Stadium & Exposition Dist. v. Fin. Guar. Ins. Co.*, 701 F.3d 39, 46 (2d. Cir. 2012) (The City "bought bond insurance from [Ambac]. The purpose of buying the bond insurance was to protect the bondholders in event of a default by the [City]. A side benefit may have been a lower interest rate—credit enhancement—but it was not part of the contract. The contract is explicit that it protects only the bondholders, and that there is no guarantee that [Ambac] will maintain any particular credit rating.").

obligation by Ambac to do so. Nor can the City's use of the term "credit enhancement device" plausibly be viewed as evidence of a larger obligation by Ambac to maintain certain underwriting standards for the term of the bonds.

The City also seems to argue the existence of *oral* agreements whereby Ambac guaranteed a credit enhancement. But its supporting factual allegations are insufficient. And its contention that such oral agreements are customary in the financial industry also lacks support.

In contrast, there are a number of cases where courts have dismissed plaintiffs' claims of a bargained for "credit enhancement" when the plaintiffs lacked an executed contract specifying such an obligation. *See, e.g., Water Works Bd. v. Ambac Fin. Grp., Inc.*, 718 F. Supp. 2d 1317 (N.D. Ala. 2010) (dismissing plaintiff's breach of contract claim alleging that surety bond insurer agreed to maintain a AAA rating as long as bonds were outstanding, because surety bond contract did not contain such a provision and such obligation was not to be implied when the sophisticated entities did not include it in the contract); *In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09 MD 2030(LAP), 2010 WL 1924719 (S.D.N.Y. May 11, 2010), *aff'd sub nom. La. Stadium & Exposition Dist. v. Fin. Guar. Ins. Co.*, 701 F.3d 39 (2d Cir. 2012) (same). The City attempts to distinguish its argument by contending that Ambac agreed to maintain certain underwriting and credit standards, instead of arguing, as other plaintiffs have done unsuccessfully, that Ambac agreed to maintain a certain credit rating. The City's reframed argument is indistinguishable from the arguments regarding maintaining credit ratings. A company's underwriting and credit standards necessarily affect its credit rating, and Ambac no more agreed to maintain certain underwriting standards than to maintain a certain credit rating during the term of the bonds. As the City was aware when it warned potential purchasers of its bonds that its credit

6

No. 15-30532

rating may change, it was also aware that Ambac's credit rating may change. The fact that this risk materialized is not a ground for relief.

Because the district court properly interpreted the Policy and because the City's argument that it created a written and oral contract with Ambac for credit enhancement is not plausible based on the facts alleged, the district court did not err in dismissing the City's breach of contract claim.

B.

Second, the City argues that the principal cause of the overall agreement was credit enhancement, and it was error for the district court to hold otherwise. The City contends that the error in the cause of the contract vitiates its consent and that it should be awarded damages to restore it to its economic position before the contract was made.

For a valid contract, Louisiana law requires that "(1) the parties must possess the capacity to contract; (2) the parties' mutual consent must be freely given; (3) there must be a certain object for the contract; and (4) the contract must have a lawful purpose." *Dameware Dev., LLC v. Am. Gen. Life Ins. Co.*, 688 F.3d 203, 207 (5th Cir. 2012). "Consent may be vitiated by error . . . ." La. Civ. Code art. 1948. "Error vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party." La. Civ. Code art. 1949. "Cause is the reason why a party obligates himself." La. Civ. Code art. 1967. "Error may concern a cause when it bears on the nature of the contract, or the thing that is the contractual object or a substantial quality of that thing, or the person or the qualities of the other party, or the law, or any other circumstance that the parties regarded, or should in good faith have regarded, as a cause of the obligation." La. Civ. Code art. 1950.

Any error about what the City was purchasing when it paid Ambac in excess of six million dollars was a unilateral error by the City because of the

clear language of the Policy. "A party's unilateral error must be reasonable or excusable in order for the error to vitiate consent." *In re Merrill Lynch*, 2010 WL 1924719 at \*5 (citing *Quality Design and Const., Inc. v. Capital Glass Co., Inc.*, 2008 0838, 2008 WL 4764341, at \*4 (La. App. 1st Cir. 10/31/08)). "Louisiana courts appear reluctant to vitiate agreements when the complaining party is, either through education or experience, in a position which renders his claim of error particularly difficult to rationalize, accept, or condone." *In re Merrill Lynch*, 2010 WL 1924719 at \*5 (quoting *Scott v. Bank of Coushatta*, 512 So. 2d 356, 362 (La. 1987)). And any unilateral error by the City about what it was purchasing from Ambac was not reasonable or excusable. Ambac's marketing of the Policy as a form of credit enhancement and its assistance in drafting the City's resolutions do nothing to support a belief that the City was purchasing a larger agreement for credit enhancement. Because the City's proffered error is unreasonable, it does not vitiate consent.

C.

Third, the City argues that Ambac not only breached its obligation to provide credit enhancement, but also did so in bad faith through the mismanagement of its own business for the purpose of its own profits. But because the City has failed to establish the existence of a larger credit enhancement agreement between it and Ambac, *see* Section II. A, *supra*, the City's bad faith claim concerning this purported agreement necessarily fails.

D.

Fourth, the City argues that the district court's dismissal of its detrimental reliance claim was error because the City was reasonable in relying on Ambac's representations regarding the credit enhancement. The City argues that Ambac's participation in drafting the resolutions—which, according to the City, evidences Ambac's obligation to provide credit enhancement—makes its reliance reasonable.

No. 15-30532

The concept of detrimental reliance is codified in Louisiana Civil Code article 1967. It states that "[a] party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying." "To establish detrimental reliance, a party must prove three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance." *Suire v. Lafayette City-Parish Consol. Gov't*, 2004-1459, 2004-1460, 2004-1466, p.31 (La. 4/12/05); 907 So. 2d 37, 59. The City cannot establish the first or the second element of detrimental reliance.

For the City to succeed on this claim, it must allege sufficient facts that Ambac represented that it would maintain its credit and underwriting standards for the term of the bonds. The City has failed to do so. As discussed above, the resolutions that the City so heavily relies upon show only that the City purchased a bond insurance policy from a highly rated insurer, which, at the time of issuance, lessened the perceived credit risk of the City's bonds. Any alleged representation by Ambac to provide a larger credit enhancement is foreclosed by the clear language of the Policy. *See In re Merrill Lynch*, 2010 WL 1924719 at *14-16 ("An unambiguous contract may be interpreted as a matter of law.") (quoting *Drs. Brethea, Moustoukas and Weaver LLC v. St Paul Guardian Ins. Co.*, 376 F.3d 399, 404 (5th Cir. 2004)). "Under Louisiana law, courts have found reliance on promises made outside of an unambiguous, fully-integrated agreement [to be] unreasonable as a matter of law." *Id.* (alteration in original) (internal quotation marks omitted).

Even if the City would have pled sufficient facts to establish such a representation by Ambac, the City would be unreasonable for relying on such a representation. The City would be relying upon general statements made by Ambac in its annual reports and references to the term credit enhancement in

the City's resolutions. The City and Ambac are sophisticated parties that engaged in arm's length negotiations with respect to this bond offering. Ambac's statements in its annual reports and the statements in the City's resolutions are "too general reasonably to rely on in light of the clarity of the parties' written agreement." *In re Merrill Lynch*, 2010 WL 1924719 at *15. Therefore, the district court properly dismissed this claim.

## III.

The district court properly dismissed the breach of contract, failure of cause, bad-faith, and detrimental reliance claims. AFFIRMED.