# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 12-30689

United States Court of Appeals
Fifth Circuit

**FILED**
July 21, 2014

Lyle W. Cayce
Clerk

CLARENCE SCHREANE,

Plaintiff - Appellant

v.

TAMECHIA BEEMON, also known as Beaumont,

Defendant - Appellee

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 1:09-CV-1252

Before SMITH, DENNIS, and HIGGINSON, Circuit Judges.

PER CURIAM:*

Clarence Schreane, proceeding *pro se*, brought suit pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), against Tamechia Beemon, a corrections officer at the federal penitentiary in which Schreane was incarcerated, asserting that Beemon violated his Eighth Amendment rights. Schreane raises two Eighth Amendment failure-to-protect claims. First, he alleges that Beemon was deliberately indifferent to a substantial risk of serious harm when she violated

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-30689

a prison policy against allowing inmates to enter units to which they were not assigned. Second, he raises a "snitch" claim, alleging that Beemon labeled him a "snitch" to other inmates and thus exposed him to a substantial risk of serious harm. The district court granted summary judgment on qualified immunity grounds in favor of Beemon. For the reasons that follow, we AFFIRM the judgment of the district court.

## BACKGROUND

### I.

In 2007, Schreane arrived at United States Penitentiary, Pollock to serve his criminal sentence. Beemon was a corrections officer who worked at the prison during Schreane's incarceration there. In January 2008, the prison's warden, Joe Keffer, issued a memorandum for both inmates and staff that reiterated various prison policies, including policies regarding acceptable attire for inmates, policies prohibiting certain decorations in cells and, as relevant here, a policy that inmates were not allowed to be present in units to which they were not assigned. The memorandum was posted throughout the prison and served as "a reminder to all inmates of some basic rules and regulations which must be followed," citing recent "assaults with weapons" and destruction of property that had taken place in the prison. Keffer emphasized in a declaration that he "instructed inmates and staff, both verbally and in writing, that inmates should not be allowed to enter housing units to which they are not assigned."

On April 22, 2008, Beemon, who had formerly been posted to a different unit, was assigned to supervise Schreane's unit. Schreane claims that he began noticing that Beemon would allow inmates from the unit she used to guard to enter his unit, in violation of the prison's policy against allowing inmates to enter units to which they were not assigned. Schreane was concerned that Beemon also "entertained" a specific inmate from the unit she

2

used to guard and would enter into long conversations with him rather than supervise Schreane's unit attentively. Schreane states that, on April 27 or 28, he privately informed the manager of his unit, Patrick Townsend, that Beemon was allowing inmates assigned to other units to visit Schreane's unit. According to Schreane, Townsend told him that he would speak to Beemon. Townsend, for his part, says that he did not recall this initial conversation with Schreane. Schreane claims that, on or about April 29, he also informed Keffer about Beemon's conduct. Schreane explained to Keffer that, several months prior, two inmates had been stabbed or beaten by inmates assigned to other units. Keffer says that he did not recall this conversation.

On May 1, 2008, Schreane says that he spoke to Beemon directly "regarding her favoritism" in allowing certain prisoners to visit from other units, explaining that inmates were "becoming irritated by her actions." According to Schreane, Beemon responded that she had worked in corrections for fourteen years and "appreciat[ed] his concern of safe housing." Beemon says that she did not recall any conversation with Schreane about inmates assigned to other units entering the unit.

As Schreane describes it, later that same evening, Beemon again allowed an inmate from the unit she used to guard to visit Schreane's unit. While Beemon and the inmate were engaged in conversation, a fight erupted in Schreane's unit, and Townsend ordered a lockdown. Townsend was in the unit at the time, and Schreane approached him to once more discuss Beemon's conduct. While in the common area, Schreane says that he "discretely" informed Townsend of the situation—that Beemon had allowed an inmate from another unit to enter Schreane's unit—and he identified the offending inmate for Townsend. Townsend recalls that Schreane raised the issue with him but did so "very loudly" and "in close proximity to other inmates." Townsend states

3

that he told Schreane "to quiet down and discuss this complaint with [him] in a proper setting."

Schreane claims that Beemon must have told the inmate assigned to another unit—the one whom Schreane had identified for Townsend—of Schreane's complaints and labeled Schreane a "snitch." That inmate allegedly informed some of his friends in Schreane's unit that Schreane had been consulting with prison authorities, and, that night, an inmate from Schreane's unit confronted Schreane in the activity room about "talking to the police" and then assaulted him. Prison medical records reflect that, at 8:45 P.M. on May 1, 2008, Schreane suffered from a laceration of the lip "secondary to blunt force trauma," seemed disoriented as to time and place, and could not remember the assault.

Beemon presents a different version of the events at issue. She acknowledges that she was aware of the prison's policy against allowing inmates to enter units to which they were not assigned and notes that "inmates have been known to enter other housing units to which they're not assigned in order to steal property, hide from other inmates, or even assault other inmates." Beemon states that she "always did her best" to prevent inmates assigned to other units from entering Schreane's unit. Beemon maintains that she never knowingly permitted inmates from other units to enter Schreane's unit and that, whenever she noticed inmates from other units, she acted immediately to remove them. As described, Beemon did not recall Schreane's speaking to her about his concerns prior to the assault. Beemon denies informing other inmates that Schreane was a "snitch" or knowing that Schreane was at risk of an assault. She further states that she found Schreane bleeding on a stairway after his assault and triggered an alarm to signal for help.

No. 12-30689

## II.

Schreane later filed this *Bivens* action in federal court, naming, as relevant here, Beemon as a defendant. The magistrate judge construed Schreane's complaint to raise, under the Eighth Amendment, both: (1) a failure-to-protect claim, in Beemon's failure to prevent the inmate assault by allowing inmates assigned to other units to enter Schreane's unit in violation of the prison's policy against this; and (2) a "snitch" claim, in Beemon's allegedly labeling Schreane a "snitch," which he claims resulted in his assault.

Schreane sought to compel the government to turn over surveillance video footage from the prison, which Schreane argued would show that while guarding Schreane's unit Beemon had willfully violated the policy against allowing inmates to enter units to which they were not assigned. The government turned over footage of the May 1, 2008 assault on Schreane but provided no further video. As the government and the prison's electronics technician explained, the prison's cameras automatically record over surveillance video after a period of fifteen to thirty days unless a prison official identifies specific footage relating to an incident warranting investigation. Other than the assault, investigators had not sought to preserve any surveillance footage. Schreane argued that he was entitled to an evidentiary inference of spoliation because the destruction of the missing footage indicated that it was harmful to Beemon. The magistrate judge, however, denied Schreane's spoliation claim.

Beemon moved for summary judgment, raising a qualified immunity defense. Ultimately, the district court granted Beemon's motion and dismissed Schreane's claims with prejudice. The district court determined that Schreane had "offered no summary judgment evidence whatsoever" in responding to Beemon's declaration denying that she had labeled him a "snitch" or had deliberately allowed inmates assigned to other units to enter Schreane's unit

5

No. 12-30689

in disregard of Schreane's safety.[1]   Schreane then filed a timely notice of appeal.

## STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo* and apply the same standard as the district court. *Dameware Dev., L.L.C. v. Am. Gen. Life Ins. Co.*, 688 F.3d 203, 206 (5th Cir. 2012).  Summary judgment is appropriate if the movant demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "[T]he party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not *negate* the elements of the nonmovant's case."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (internal quotation marks omitted). "We construe all facts and inferences in the light most favorable to the nonmoving party when reviewing grants of motions for summary judgment." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) (internal quotation marks omitted); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam).

---

[1] We note that the district court should have considered Schreane's verified complaint on summary judgment.  Allegations in a verified complaint may serve as summary-judgment evidence. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994).  To verify the complaint, a plaintiff may include "a signed declaration under penalty of perjury that the foregoing is true and correct." *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003) (internal quotation marks omitted).  Specific statements in the complaint, to be available as evidence, must also meet the requirement, contained in Federal Rule of Civil Procedure 56, that "they be within the personal knowledge of the affiant, that they otherwise would be admissible into evidence, and that the affiant be competent to testify." *Huckabay v. Moore*, 142 F.3d 233, 240 n.6 (5th Cir. 1998); *see* FED. R. CIV. P. 56(c)(4).

In this case, Schreane's complaint concludes with an executed "Plaintiff's Declaration," which reads: "I declare under penalty of perjury that all of the facts represted [sic] in this complaint is true, and correct, 28 U.S.C. 1746."  Because this statement reproduces almost exactly the verification language this court described in *Hart*, *see* 343 F.3d at 765, we conclude that the district court should have considered Schreane's verified complaint as summary-judgment evidence.

No. 12-30689

## DISCUSSION

## I. Spoliation Claim

"Under the spoliation doctrine, a jury may draw an adverse inference that a party who intentionally destroys important evidence in bad faith did so because the contents of those documents were unfavorable to that party." *Whitt v. Stephens Cnty.*, 529 F.3d 278, 284 (5th Cir. 2008) (internal quotation marks omitted). An adverse inference of spoliation can be relevant on summary judgment. *See Byrnie v. Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) ("In borderline cases, an inference of spoliation, in combination with some (not insubstantial) evidence for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." (internal quotation marks omitted)). "The Fifth Circuit permits an adverse inference against the destroyer of evidence only upon a showing of 'bad faith' or 'bad conduct.'" *Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005). The defendant's adherence to standard operating procedures in destroying the evidence, however, may counter a contention of bad faith conduct. *See Vick v. Tex. Emp't Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975). We review the district court's decision whether to permit an evidentiary inference of spoliation for abuse of discretion. *King v. Ill. Cent. R.R.*, 337 F.3d 550, 553, 555 (5th Cir. 2003).

In this case, there is no dispute that the surveillance tape that Schreane wanted was erased. In response to Schreane's request for the footage leading up to the day of his attack, the government produced all that remained: the few minutes of Schreane's assault on May 1, 2008. The government also provided the affidavit of an electronics technician at the prison, Derrick Cox, who described the prison's general policy of automatically recording over surveillance video that has not been marked for investigation within fifteen to thirty days of its recording. *Cf. id.* at 556 (noting that defendant's compliance

with a federal preservation regulation, after which "the records are destroyed as a part of routine file maintenance," "further demonstrat[ed] that [the defendant] lacked a 'bad faith' motive for [the records'] destruction").

Schreane claims that Beemon or some other prison official purposefully destroyed the footage in bad faith because it would have shown damning evidence of Beemon allowing inmates assigned to other units to enter Schreane's unit and generally ignoring her duties.  Beyond this accusation, however, Schreane offers no evidence that anyone who knew of his objections to Beemon's conduct (Beemon, Townsend, or Keffer) was involved in the decision to record over the tape.  In fact, there is no indication that any prison official even viewed the footage because, as Cox explained, it "is not live-monitored 24-hours a day." *Cf. Bracey v. Grondin*, 712 F.3d 1012, 1015, 1019-20 (7th Cir. 2013) (affirming the district court's finding of no spoliation when prison surveillance cameras erased footage three days after an incident, pursuant to standard procedure, and the plaintiff offered no proof that any officials viewed the footage in question prior to its erasure).  Schreane has therefore failed to make the requisite showing of bad faith to be entitled to a spoliation inference.  Accordingly, the district court did not abuse its discretion in denying Schreane's spoliation claim.

## II.  Eighth Amendment Claims
### A.  Violation of Policy Claim

Schreane argues that Beemon violated his constitutional rights when she failed to protect him against harm from other inmates.  He contends first that Beemon failed to protect him by permitting inmates assigned to other units to enter his unit, which exposed him to a substantial risk of serious harm. Beemon moved for summary judgment on the basis of qualified immunity, which has two components: (1) the violation of a constitutional right (2) that was clearly established at the time of the defendant's conduct.  *Pearson v.*

*Callahan*, 555 U.S. 223, 232 (2009). In applying this test, courts may address either of the two components first. *Id.* at 236. The plaintiff must bear the burden "to prove that a government official is not entitled to qualified immunity." *Wyatt v. Fletcher*, 718 F.3d 496, 502 (5th Cir. 2013).

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. CONST. amend. VIII. It requires the humane treatment of prisoners and, more specifically, requires prison employees to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks omitted). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. For a prison guard's failure to protect an inmate from assault to violate the Eighth Amendment, the guard must have acted with "deliberate indifference" and subjected an inmate "to a substantial risk of serious harm." *Id.* at 828-29, 834, 844 (internal quotation marks omitted). A defendant may escape liability by "respond[ing] reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

Deliberate indifference is a subjective inquiry. *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 255 (5th Cir. 2005). "An official is deliberately indifferent when he 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Johnson v. Johnson*, 385 F.3d 503, 524 (5th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837). The plaintiff may prove deliberate indifference with circumstantial evidence, including by "showing that the risk was so obvious that the official must have known about it." *Id.* The relevant risk of harm encompasses both "current threats" and "sufficiently imminent dangers that

are likely to cause harm in the next week or month or year." *Horton v. Cockrell*, 70 F.3d 397, 401 (5th Cir. 1995) (internal quotation marks omitted).

Schreane argues that the record, which we must read in the light most favorable to him, *see Tolan*, 134 S. Ct. at 1863; *Dillon*, 596 F.3d at 266, reflects a genuine issue of material fact as to whether Beemon was "aware of facts from which the inference could be drawn that a substantial risk of harm exist[ed]," "dr[ew] the inference" herself, and yet disregarded it. *Johnson*, 385 F.3d at 524 (internal quotation marks omitted). In support of his argument, Schreane offers evidence that he brought his concerns not only to Beemon's attention, but also to the attention of her supervisors, Keffer, the warden, and Townsend, the unit manager. Beemon also acknowledges in her unsworn declaration that she was "aware" of the prison's policy against allowing inmates to enter units to which they were not assigned. Although Schreane has offered summary judgment evidence that Beemon violated this policy, our inquiry cannot end there.

To overcome qualified immunity, Schreane must show that Beemon violated a right that was "clearly established" at the time. *Pearson*, 555 U.S. at 232. Schreane need not demonstrate that "the very action in question has previously been held unlawful," but "in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Certainly, it has long been clearly established that a prison guard violates the Eighth Amendment by *causing* an inmate to be assaulted. *See, e.g.*, *Farmer*, 511 U.S. at 833 ("gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective" (internal quotation marks omitted)); *Irving v. Dormire*, 519 F.3d 441, 447-48 (8th Cir. 2008) (denying qualified immunity where prison guards opened cell doors so as to allow a prisoner to attack the plaintiff). Here, however, the causal relationship between Beemon's violation of the policy and the assault that

No. 12-30689

Schreane suffered is so attenuated that it is beyond clearly established law. *See Pearson*, 555 U.S. at 232. Indeed, the facts show that Schreane was assaulted by someone from his *own* unit. As a result, any connection between that assault and Beemon's occasional violation of the policy against allowing prisoners from one unit to enter another is unclear at best. Accordingly, Schreane has not overcome Beemon's defense of qualified immunity.

### B. "Snitch" Claim

Schreane asserts that Beemon labeled him a "snitch" to other inmates, thereby placing him at risk of the violent assault he suffered on May 1, 2008. The Eighth Amendment duty to protect inmates from harm can be violated when a prison official acts with deliberate indifference by exposing a prisoner to physical assault through labeling him a "snitch" to other inmates. *See, e.g.*, *Adames v. Perez*, 331 F.3d 508, 515 (5th Cir. 2003). Schreane claims that Beemon must have told an inmate assigned to another unit (the one whom Schreane had identified for Townsend on the day of the lockdown) that Schreane was a "snitch," that this inmate then told unidentified inmates from Schreane's own unit what Beemon had told him, and that Schreane was thereafter assaulted. However, the only admissible evidence that Schreane offers in support of his claim that Beemon labeled him a "snitch" is that his assault came soon after his various complaints regarding Beemon's conduct and that the person assaulting him mentioned that Schreane had been "talking to the police." Schreane does not, for instance, assert that he himself heard Beemon label him a "snitch," nor does he offer any corroboration from other inmates to that effect. *Cf. White v. Fox*, 470 F. App'x 214, 220, 223 (5th Cir. 2012) (per curiam) (reversing summary judgment on failure-to-protect claim where plaintiff supported his assertions of being labeled a "snitch" with two sworn affidavits from fellow prisoners). Schreane offers only an unsubstantiated assertion that Beemon labeled him a "snitch." *See Ragas v.*

11

*Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) ("[U]nsubstantiated assertions are not competent summary judgment evidence."). Because there is no dispute as to any material fact regarding Schreane's "snitch" claim, summary judgment was warranted for this claim as well.

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment is AFFIRMED.