# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 15, 2023

Lyle W. Cayce
Clerk

No. 22-30638

Billy Van Winkle, Jr.,

*Plaintiff—Appellant*,

*versus*

James Arthur Rogers; New Prime, Incorporated, *doing business as* Prime, Incorporated; Ace American Insurance Company,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:19-CV-1264

Before Davis, Southwick, and Oldham, *Circuit Judges*.
Leslie H. Southwick, *Circuit Judge*:

Plaintiff filed suit against a truck driver, trucking company, and insurance company. The claim was that the tread from a tire on Defendants' tractor-trailer separated from the tire core and hit Plaintiff's vehicle on an interstate highway. Plaintiff was injured in the resulting crash. Though the remnants of the damaged tire were initially saved, they were later destroyed as a result of what Defendants claim was simple negligence. The district court granted summary judgment in favor of Defendants. On appeal, Plaintiff

contends the district court erred in ruling on several motions. The central question is whether the district court was correct to hold that there were no genuine issues of material fact regarding whether Defendants acted in bad faith in destroying the tire. We find there were fact issues. REVERSED and REMANDED in part; AFFIRMED in part.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 6, 2018, Billy Van Winkle, Jr., was driving on an interstate highway in Louisiana when his car was struck by part of a tire that came from the tractor-trailer being driven directly in front of him. The resulting crash caused serious injuries to Van Winkle and damage to his vehicle. The tractor-trailer was owned by Defendant New Prime, Inc. d/b/a Prime, Inc. and operated by its employee, Defendant James Arthur Rogers. The tread of the failed tire — a refurbished, retread tire manufactured by Prime's own EcoTire facility — separated from the casing or tire core before it hit Plaintiff's vehicle.

Rogers reported the crash directly to Prime via the Qualcomm system in the tractor-trailer immediately after it occurred. A replacement tire was attached at the scene. Prime instructed Rogers to load the tire remnants onto the tractor-trailer before he left. The tractor-trailer continued on its route until it reached Prime's facility in Salt Lake City, Utah. What happened to the tire remnants is unknown, but Prime stated it was likely they were sold for scrap about six weeks after the crash.

On January 22, 2019, Van Winkle filed a petition for personal injuries against Rogers, Prime, and their insurer, Ace American Insurance Company, in the 15th Judicial District Court for Acadia Parish, Louisiana. Defendants removed the case to the United States District Court for the Western District of Louisiana based on diversity jurisdiction.

No. 22-30638

Trial was reset at least twice because of the COVID-19 pandemic and a scheduling conflict. On February 18, 2021, three years after the accident and two years after suit was filed, Defendants filed their first motion for summary judgment. The district court denied Defendants' motion for summary judgment without prejudice in light of Van Winkle's requests to extend discovery deadlines.

Van Winkle amended his complaint on September 29, 2021, reiterating his claims for Rogers's negligence in the operation and care of the tractor-trailer and his claim against Prime for vicarious liability. Van Winkle also pled a claim against Prime for alleged negligence in the training and supervision of Rogers and the care and maintenance of the tractor-trailer and tire. Importantly, Van Winkle alleged that Prime "destroyed evidence, specifically the retreaded trailer tire that failed," that Prime "had a duty to preserve the failed retreaded tire and intentionally destroyed evidence that was relevant, irreplaceable, unique and critical to any potential future litigation and the degree of fault of Defendants," and that "this destruction clearly deprived plaintiff of this evidence."

The district court rejected Van Winkle's arguments about the destruction of evidence. It granted summary judgment to Defendants. Van Winkle timely appealed the judgment.

## DISCUSSION

Van Winkle argues that the district court erred in these ways:

(1) Denying Van Winkle's motion for sanctions for spoliation of the tire evidence. We review a district court's denial of a motion for sanctions for abuse of discretion. *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015).

(2) Holding Van Winkle's expert witness did not have sufficient knowledge and expertise to testify about the cause of the commercial truck

tire failure. Exclusion of expert testimony is reviewed for abuse of discretion. *In re Complaint of C.F. Bean, L.L.C.*, 841 F.3d 365, 369 (5th Cir. 2016).

(3) Granting Defendants' motion for summary judgment and (4) denying Van Winkle's motion for partial summary judgment. We review a grant of summary judgment *de novo*. *Petro Harvester Operating Co. v. Keith*, 954 F.3d 686, 691 (5th Cir. 2020). The district court's construction of the amended complaint is reviewed *de novo*. *Ruiz v. Brennan*, 851 F.3d 464, 468 (5th Cir. 2017).

(5) Denying Van Winkle's motion to amend his prior motion *in limine* to exclude Defendants' surveillance evidence. We review the denial of a motion *in limine* for abuse of discretion and a showing of prejudice. *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 643 (5th Cir. 2005).

We analyze the arguments in that order.

## I.    *Spoliation of the tire evidence*

"Spoliation of evidence is the destruction or the significant and meaningful alteration of evidence." *Guzman*, 804 F.3d at 713 (quotation marks and citation omitted). "We permit an adverse inference against the spoliator or sanctions against the spoliator only upon a showing of bad faith or bad conduct." *Id.* (quotation marks and citation omitted). "Under the spoliation doctrine, a jury may draw an adverse inference that a party who intentionally destroys important evidence in bad faith did so because the contents of those documents were unfavorable to that party." *Whitt v. Stephens Cnty.*, 529 F.3d 278, 284 (5th Cir. 2008) (quotation marks and citation omitted). "Bad faith, in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence." *Guzman*, 804 F.3d at 713.

Van Winkle asserts that Prime's disposal of the tire under these circumstances demonstrates bad faith. The district court denied the motion for

sanctions due to spoliation "after an exhaustive review of the arguments and evidence." The court noted it is undisputed that Prime intentionally destroyed crucial evidence. The court denied the motion for sanctions because, "[a]lthough Prime should have preserved the tire, Plaintiff's arguments that Prime intentionally destroyed the tire in bad faith in order to hide adverse evidence from Plaintiff are highly speculative." Nevertheless, the court concluded that, because "Plaintiff has been prejudiced due to his inability to inspect and test the failed tire," "the Court will permit Plaintiff to question the witnesses in detail as to the destruction of the failed tire" and "to argue whatever inference he urges should be drawn due to the absence of the failed tire."

Van Winkle could present only circumstantial evidence to show bad faith: (1) Prime's destruction of the failed tire, knowing that litigation was likely; (2) Prime's failure to maintain records regarding its remanufactured tires; (3) Prime's admission (later withdrawn) that it received a letter of representation from Van Winkle's counsel 10 days before the tire was destroyed; (4) Prime's withholding of claims notes, made on the day of the crash and 10 days later, as alleged work product; and (5) Prime's "deceptive discovery tactics, including attempting to hide the identity of the manufacturer of the [t]ire for over two years."

Van Winkle does not elaborate on the last two arguments. He does not explain how defense counsel's assertion of a privilege more than a year after the disposal of the tire tends to show that the tire was thrown away because Prime knew it was defective. Likewise, Van Winkle neither provides record cites for, nor elaborates on, his assertion that Prime engaged in "deceptive discovery tactics." Accordingly, we find these contentions to be improperly briefed and focus instead on his first three arguments for bad faith. *See Crose v. Humana Ins. Co.*, 823 F.3d 344, 351 n.5 (5th Cir. 2016).

"A party's duty to preserve evidence comes into being when the party has notice that the evidence is relevant to the litigation or should have known that the evidence may be relevant." *Guzman*, 804 F.3d at 713. On the day of the accident, Rogers advised Prime that the tractor-trailer "blew" a tire and Van Winkle's vehicle was hit by debris from the tire failure, that Van Winkle was injured, that emergency crews were on the way and law enforcement had arrived, and that Van Winkle had been taken to the hospital and his car was "severely damaged" and towed from the scene of the crash. We agree with the district court that this notice was enough to create the obligation to retain the tire.

Van Winkle also argues Prime had actual notice that he had retained an attorney before the tire was destroyed, and that disposing of the tire with such notice is bad faith. Prime disputes this. Van Winkle relies on a letter from his counsel dated March 8, 2018, addressed to Prime's claims manager, Kevin French, and sent by e-mail. According to Prime, its counsel initially took the letter at face value and admitted in discovery responses that this letter had been received. French's deposition, though, French testified that both the e-mail address and the physical address for the letter were incorrect and that he never received the email or the letter. The email server for Van Winkle's counsel reflected that the e-mail transmitting the letter had not been delivered. Given these facts, Defendants moved for leave to withdraw their admission that they received the letter. The trial court granted the motion to withdraw. There was no error in allowing the withdrawal, as there is no evidence that counsel's letter was received by Prime before the tire remnants were discarded. Nonetheless, as we already explained, the district court determined Prime was on notice from the events at the time of the accident that the tire would likely be relevant to a claim by the injured driver.

Prime, of course, failed to retain the tire. Following the crash, the tire scraps were loaded onto Prime's truck at the accident scene. They were

discarded some time after the truck reached Prime's Salt Lake City facility, 40 days and 1,600 miles later.  There is no bad faith in the destruction of evidence if, "at the time [the alleged spoliator] disposed of this potential evidence, it was unaware that it might be relevant to [the plaintiff's] claims." *King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003).  Alternatively, a moving party "would have . . . a stronger argument for spoliation [if she could] prove that the [evidence was] destroyed after [the spoliator] had notice of their relevance to her claim." *Russell v. Univ. of Tex. of Permian Basin*, 234 F. App'x 195, 208 (5th Cir. 2007).  When Prime disposed of the tire, it was fully aware of the relevance of the tire to a potential claim.

Prime has no evidence of what actually happened to the remnants of the tire.  It proposes that, likely, a Prime employee discarded or sold the tire scraps when the truck reached Salt Lake City.  A Prime representative, designated under Federal Rule of Civil Procedure 30(b)(6), was deposed and stated it was a customary practice to dispose of a tire that had reached the end of its useful life and that the blown-out tire was unusable.  Defendants insist that bad faith is not established merely through loss of evidence in the ordinary course of business or through the defendant's adherence to standard operating procedures in destroying the evidence.  *See Vick v. Tex. Emp't Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975); *Coastal Bridge Co. v. Heatec, Inc.*, 833 F. App'x 565, 573–74 (5th Cir. 2020).

We already mentioned that there is no direct evidence of what happened to *this* tire following the crash.  During oral arguments, Defendants' counsel could not explain why the tire was transported to Prime's Salt Lake City facility.  Counsel would not state why Prime would have had the tire remnants retrieved from the side of the road following the blowout, though he acknowledged that "a conceivable purpose" for removing the tire was to preserve it.  Prime's corporate counsel, designated under Rule 30(b)(6), testified during a deposition that, although Prime does not have a written policy

to preserve its equipment that causes an injury, "[i]f [Prime] think[s] it's going to be part of litigation, yes, we do our best to preserve it." In contrast, Prime's appellate counsel during oral arguments stated that Prime has no policy governing situations where, like here, a Prime tire is involved in an accident. Instead, preservation is "a case-by-case" determination. Counsel also stated that Prime did not have the equivalent of a designated storage area at its facility in Salt Lake City in which such damaged tires are kept. All of this is simply an assertion by Prime that it has no actual knowledge of what happened to the tire and an admission that it has no formal preservation or retention policies.

Defendants rely on two of our prior opinions in which we found that companies' adherence to standard operating procedures shielded them from an adverse inference of spoliation. *See Vick*, 514 F.2d at 737; *Schreane v. Beemon*, 575 F. App'x 486, 490–91 (5th Cir. 2014). We find both cases to be distinguishable.

In the opinion that is precedential, we found no evidence of bad faith when the records the plaintiff sought were destroyed pursuant to the defendant's regulations governing disposal of inactive records. *Vick*, 514 F.2d at 737. "There was indication here that the records were destroyed under routine procedures without bad faith and well in advance of [the plaintiff's] service of interrogatories." *Id.* We explained that "[m]ere negligence is not enough, for it does not sustain an inference of consciousness of a weak case." *Id.* (quoting MCCORMICK, EVIDENCE § 273 at 660–61 (1972)).

Quite differently, Prime was on notice that parts of the tire — the most crucial piece of evidence to a potential lawsuit — caused an accident. Why the tire separated was a fact question that would need answering, and Prime was on notice of the need from the accident itself and the injuries to Van Winkle. The disappearance of the tire remnants did not occur long after the

accident; the relevance of the tire was known.  Prime speculates that the tire remnants were accidentally sold or destroyed pursuant to its ordinary course of business, though the company knew the evidence should be preserved.

We disagree with the district court that this shows only negligence. The need for the material from the tire to be preserved was critical.  There was evidence that Prime had its own recapping operation on or near the Salt Lake Facility, and those tires were used on Prime's tractor-trailers.  The failure of a company in the business both of recapping tires and then using them on its vehicles to have policies in place to preserve evidence such as this, and its inability to produce any actual evidence of what happened to the tire, creates a fact question on bad faith.  *See Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 620, 643–44 (S.D. Tex. 2010) (finding the evidence created a fact question for the jury on bad faith when "[t]he defendants' proffered reasons and explanations for [destroying the evidence] are inconsistent and lack record support").

In the second opinion, which is non-precedential, there was no dispute that the prison surveillance videotape the plaintiff sought was erased. *Schreane*, 575 F. App'x at 490.  The government presented an affidavit from an electronics technician at the prison who explained the prison's policy. *Id.* The relevant cameras automatically recorded over surveillance video after 15 to 30 days unless a prison official identified specific footage relating to an incident warranting investigation. *Id.* at 489–90.  Additionally, the court found there was no evidence that any prison official viewed the video footage before the cameras automatically erased it. *Id.* at 491.  There was no knowledge on the part of the prison authorities that the video was needed until after the erasures. *Id.*  Prison officials preserved and produced the recording of the few minutes of the assault being investigated, but not the time leading up to it. *Id.* at 489–90.  Conversely, here, Prime preserved and produced nothing.

Another of our cases, cited by neither party on appeal, is likewise distinguishable. *See King*, 337 F.3d at 556. In that case, we found no evidence of bad faith when, at the time the defendant disposed of potential evidence, "it was unaware that it might be relevant to [the plaintiff's] claims." *Id.* The plaintiff did not notify the defendant that the evidence sought, a railroad signal at a crossing, malfunctioned at the time of the accident, nor did the plaintiff request access to the defendant's records or the signal. *Id.* It was not until nearly three years after the destruction of the signal that the plaintiff first informed the defendant that he was seeking recovery based on the alleged signal malfunction. *Id.* Further, the defendant "presented evidence showing that it disposed of the documents and the signal for innocuous reasons." *Id.* The records were maintained for one year pursuant to a federal regulation and then "destroyed as a part of routine file maintenance." *Id.* The signal was destroyed several months after the accident when the defendant, as part of an overall system upgrade, installed a new signal and sold the old one as scrap. *Id.*

In contrast, Prime asserts that it likely destroyed the tire scraps six weeks after the accident, though it had been immediately notified that the tire would be at the center of any litigation stemming from the accident. Moreover, unlike the defendant in *King*, Prime has no actual knowledge of what happened to the tire scraps.

We agree with another circuit court, in the context of spoliation, that "bad faith is a question of fact like any other." *Bracey v. Grondin*, 712 F.3d 1012, 1019 (7th Cir. 2013) (quotation marks and citation omitted). If a genuine dispute of material fact exists as to bad faith, a jury should make that determination. One circuit court agreed with giving the issue of bad faith to jurors:

No. 22-30638

> We conclude that the district court acted within its discretion in permitting the jury to draw an adverse inference if it found that [the spoliator] caused destruction or loss of relevant evidence. Rather than deciding the spoliation issue itself, the district court provided the jury with appropriate guidelines for evaluating the evidence.

*Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 157 (4th Cir. 1995). Another circuit court found no error when the district court issued a permissive adverse inference jury instruction to allow the jury to resolve the genuine disputes of material fact concerning spoliation. *GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 81–85 (3d Cir. 2019).

Courts in this circuit have sent such fact questions to the jury before. For instance, a panel of this court affirmed a district court's adverse inference jury instruction, permitting jurors to determine bad faith. *See Union Pump Co. v. Centrifugal Tech. Inc.*, 404 F. App'x 899, 906 & n.4 (5th Cir. 2010). The instructions there allowed an inference that the destroyed evidence would have been detrimental to the defendants' case if jurors "determined that the evidence was in the control of the defendants, that they had an obligation to preserve it, that the destroyed evidence was relevant to the litigation, and that the evidence was destroyed intentionally and in bad faith." *Id.* at 903–04. The district court there declined to rule on the plaintiff's motions for sanctions, for an adverse inference instruction, and for summary judgment with respect to its spoliation claims. *Id.* at 903. Instead, the district court "decided that evidence regarding spoliation can be presented to, and the issue will be decided by, the jury. The issue of sanctions shall be addressed by the Court after the jury returns its verdict." *Id.* (quotation marks and alterations omitted). This court did not disturb those procedures. *Id.* at 904-07.

No. 22-30638

Likewise, we have cited with approval a district court's decision to give "both parties the freedom to put forward evidence about document destruction" and to defer a decision on whether a spoliation instruction is warranted until the close of trial. *See BCE Emergis Corp. v. Cmty. Health Sols. of Am., Inc.*, 148 F. App'x 204, 219 (5th Cir. 2005).[1]

Turning to this case, we find there is sufficient circumstantial evidence to create a genuine dispute of material fact as to whether Defendants destroyed the tire in bad faith. Plaintiff should be permitted a jury instruction that if jurors find bad faith, they may infer that the destroyed evidence would have been adverse to Prime's defense in this suit.

Our holding, that bad faith in this case is a fact question that should be sent to the jury upon a showing of a genuine dispute, does not indicate that district courts should freely give such an issue to the jury. We emphasize that the need to do so here stems from the following circumstantial evidence: Prime destroyed the most crucial piece of evidence just weeks after learning that its tire may have caused a car accident; Prime cannot explain why it transported the tire to its Salt Lake facility or what happened to the tire following the accident; and Prime cannot demonstrate it had any formal preservation or retention policy for its equipment, like tires, that may have caused an injury. These circumstances create a fact question on bad faith, necessitating a jury determination.

---

[1] Other district courts in the Fifth Circuit also have permitted similar adverse inference jury instructions when the evidence generated a fact question on a spoliator's bad faith. *See, e.g., Cornejo v. EMJB, Inc.*, No. SA-19-CV-01265-ESC, 2021 WL 4526703, at *5 (W.D. Tex. Oct. 4, 2021) ("Although the Court agrees that there is no direct evidence establishing [the spoliator's] bad faith, a jury could nonetheless infer some degree of culpability based on several pieces of circumstantial evidence."); *Rimkus*, 688 F. Supp. 2d at 620, 643–44.

The district court abused its discretion in denying Van Winkle's motion for sanctions for spoliation.

As a result of our holding, we will remand to the district court. That impacts several of the issues that have been raised. We address only those that might still have relevance on remand.

## II.    Van Winkle's expert

Federal Rule of Evidence 702 provides the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Experience alone can provide a sufficient foundation for expert testimony. FED. R. EVID. 702, Advisory Committee Notes on 2000 Amendments. "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).

Van Winkle argues the district court abused its discretion in limiting the testimony of his commercial trucking and safety expert, Roger Allen. Van Winkle insists Allen is qualified to testify concerning the issues in this case. Allen testified that his opinion was based on his 62 years of hands-on experience in the trucking business, "not counting that I've been around trucks all my life." The district court noted: (1) "Allen is qualified to offer expert opinions under Rule 702 with respect to the applicable safety regulations and

No. 22-30638

practices governing the commercial trucking industry"; (2) Allen has extensive experience driving all types of gasoline and diesel engine trucks, tractors, trailers and buses; (3) Allen has "extensive experience in the commercial trucking industry, including safety regulations and practices"; and (4) "courts have accepted Allen as an expert in commercial trucking safety standards and practices in similar cases." Van Winkle contends the district court improperly focused on Allen's "little experience or specialized knowledge with respect to tire retreading or tire failures."

The district court held Allen did not have the expertise to offer opinions on the key liability issues in this case. These are the issues: (1) "the mechanics or cause of the tire failure"; (2) "the tire retreading process"; (3) "the normal life expectancy of the tire"; (4) "the extent to which that tire failure resulted from a defect in the tire"; and (5) whether "a manufacturing defect caused the [tire] failure."[2] The court accordingly excluded his opinions on defect and causation. The district court quoted Allen's testimony as to his lack of qualification regarding tire manufacturing, tire retreading, tire failures, and accident reconstruction:

> Q:   Have you ever worked for a tire manufacturer?
> A:   No, sir, I have not.
> Q:   Have you ever worked for a company that manufactures retreaded or recapped tires?
> A:   No, sir.
> Q:   Have you ever consulted with a company that recaps or retreads tires?
> A:   No, sir.
>                       ***

---

[2] The district court held Allen would be permitted to give the following opinions: (1) general background testimony on federal regulations; (2) quoting and referring to relevant safety regulations; (3) general (non-regulatory) industry safety standards and practices; and (4) whether Defendants complied with industry standards and practices.

Q:   Do you have any educational background in the manu-
     facturing of tires?

A:   No, sir.

                        ***

Q:   Have you ever been involved in the process of retread-
     ing or recapping a tire?

A:   I already answered that.  No, sir.

                        ***

Q:   Have you ever been involved in the manufacturing of a
     tire?

A:   Already answered that.  No, sir.

                        ***

Q:   Have you published any materials as it relates to the re-
     treading and recapping of tires?

A:   No, sir.  I am in the trucking business, not the retreading
     — but I want to know, every time I had a blowout, why
     it happened so I can make sure it didn't happen again,
     sir.

Q:   Have you ever presented on the topic of retreading and
     recapping tires?

A:   I'm not qualified to do that, sir.  I am qualified to know
     what tires look like and the condition they're required
     to be kept in to be safe for myself and everybody around
     me, sir.

Allen himself admitted his lack of qualification and expertise.  Accord-
ingly, Van Winkle has not shown the district court abused its discretion in
limiting Allen's expert testimony.  Of course, our holding that a factual issue
of bad faith is for the jury creates a possible source of evidence favorable to
Van Winkle's claims.  Whether a different expert, or different expertise, is
properly offered as to that evidence is for the district court to determine
should the need to do so arise.

No. 22-30638

### III.   *Defendants' motion for summary judgment*

Summary judgment is appropriate only if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  In deciding whether a fact issue has been created, "the inferences to be drawn from the evidence must be viewed in the light most favorable to the nonmoving party."  *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 310 (5th Cir. 2002).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The district court stated three independent grounds for granting Defendants' motion for summary judgment.  We discuss all three.

*First*, the district court determined Van Winkle forfeited his negligence claims because his opposition to summary judgment did not address those claims on the merits.  Van Winkle's opposition made no effort to show that Rogers as driver of the tractor-trailer or Prime had knowledge of an unreasonably dangerous condition in the tire as required by Article 2317.1 of the Louisiana Civil Code.  Instead, Van Winkle's opposition to the motion cited evidence that the tire had been thoroughly and properly inspected by Rogers for signs of damage, proper inflation, proper alignment, and sufficient tread.  According to Van Winkle, the only reasonable explanation was a manufacturing defect.  The district court found that the opposition effectively abandoned any negligence claims and attempted to transform the case into a manufacturing defect claim under the Louisiana Products Liability Act ("LPLA"), LA R.S. 9:2800.51, *et seq.*  Van Winkle does not appear to challenge this finding on appeal; instead, he explains why a valid LPLA claim exists.

16

Our allowing the issue of bad faith to go to jurors potentially changes the evidentiary foundation for the claims. Issues of causation will need to be addressed anew on remand.

*Second*, the district court found that Van Winkle's Amended Complaint failed to plead a manufacturing defect claim under the LPLA. Under the LPLA, a product may be deemed "unreasonably dangerous" in one of four ways: construction or composition, design, inadequate warning, or non-conformity with an express warranty. LA R.S. 9:2800.54(B). The plaintiff can prove a construction defect by showing that, at the time it left its manu-facturer's control, the defendant's "product deviated in a material way from the manufacturer's specifications or performance standards for the product" or "deviated in a material way from . . . otherwise identical products manu-factured by the same manufacturer." LA R.S. 9:2800.55.

When Defendants filed their second motion for summary judgment after nearly three years of litigation, Van Winkle's opposition expressly raised for the first time a manufacturing defect claim under the LPLA. The district court held the Amended Complaint did not plead an LPLA claim and refused to allow the untimely claim:

> The Court finds the foregoing statements are insufficient to give Defendants "fair notice of what the . . . claim is and the grounds upon which it rests." Plaintiff does not include any allegations indicating that any defect in the failed tire existed at the time it left Prime's control, or that the tire deviated from Prime's normal specifications and performance standards, or from other identical tires manufactured by Prime. And while not necessarily dispositive, nowhere in the Complaint does Plaintiff use the term "products liability," nor does he cite to the LPLA. Indeed, it is only by implication and reading the Complaint in the broadest possible manner that one can infer that Plaintiff is alleging Prime is a "manufacturer" under the LPLA. The Court therefore finds that the Complaint reflects

only the claims addressed in Defendants' motion, and Plaintiff did not plead the claim he now asserts.

We disagree. The Amended Complaint references a "defect," the "manufacture[r]" of the tire, and the "unsafe or unreasonably dangerous" condition of the tire.[3] The Amended Complaint thus uses the key legal language for each element of a manufacturing defect claim under the LPLA, putting Defendants on notice of a manufacturing defect claim. This is sufficient to satisfy the pleading requirements of Federal Rule of Civil Procedure 8, particularly as "it is unnecessary to set out a legal theory for the plaintiff's claim for relief." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014) (quotation marks and citation omitted).

*Third*, the district court found that, alternatively, even if it considered Van Winkle's LPLA claim, summary judgment would still be proper. The district court reasoned that Van Winkle introduced no evidence as to the tire's specifications or how the tire supposedly deviated from them, or how that deviation supposedly created an unreasonably dangerous condition that caused the tire to fail. *See* LA R.S. 9:5800.55.

We see the potential for a different evidentiary dynamic on remand because a fact issue exists as to whether Defendants disposed of the tire in bad faith. If the trier of fact finds a bad faith motive, Van Winkle is entitled to an adverse inference that Defendants destroyed the tire because they knew

---

[3] Van Winkle alleged that: (1) "the tire failed when the tread of the tire completely separated from the tire core or casing"; (2) Prime "failed to exercise reasonable care in the *manufacture*, inspection, maintenance, and repair" of the tractor-trailer and the tire; (3) "the condition of [the] retreaded tire was *unsafe or unreasonably dangerous*"; (4) the tire was "an *unreasonably dangerous* thing" containing a "*defect* which caused Plaintiff's damages"; (5) the tire "had not been properly *manufactured* and maintained before the 'blow out'"; and (6) the tire "was unsafe, had an *unreasonably safe condition* and/or was not fit for its intended purpose." In his Amended Complaint, Van Winkle repeatedly alleged that Defendants were liable for the improper "manufacture" of the tire.

it was unfavorable to them. The possibility of such an inference makes it impossible to determine the validity of the district court's alternative decision for granting summary judgment. "[A]n inference of spoliation, in combination with some (not insubstantial) evidence for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." *Whitt*, 529 F.3d at 285.

We reverse the district court's grant of summary judgment.

### IV.   *Van Winkle's motion for partial summary judgment*

Van Winkle sought summary judgment on two affirmative defenses by Defendants, those of third-party fault and sudden emergency. The district court denied Van Winkle's motion, citing Rogers's testimony that the blowout occurred when he hit a "pretty good sizable bump" in the road.

We first consider the affirmative defense of third-party fault. For the custodian of a highway, such as the State of Louisiana, to be held liable for third-party fault, Defendants must prove that (1) the State had custody of the thing which caused Van Winkle's damages, (2) the thing was defective because it had a condition which created an unreasonable risk of harm, (3) the State had actual or constructive notice of the defect and failed to take corrective measures within a reasonable time, and (4) the defect was a cause-in-fact of Van Winkle's injuries. *See Boothe v. Dep't of Transp. & Dev. & Par. of E. Baton Rouge*, 285 So. 3d 451, 456–57 (La. 2019).

As the district court noted, "no evidence has been presented to the Court by Defendants that any third party or non-party knew or should have known about any defect in the roadway that caused the accident." Thus, Defendants did not carry their burden on summary judgment of showing that the sole cause of the crash was the fault of any third party. The district court erred in holding otherwise. The court should have foreclosed use of that defense at trial.

Van Winkle does not explain, however, how the district court erred in denying summary judgment on Defendants' other defense of sudden emergency or unforeseen act. He does not even recite the elements of the defense or cite any caselaw to support his general assertion that the district court erred. Thus, Van Winkle has abandoned this argument on appeal for failure to brief it. *See Crose*, 823 F.3d at 351 n.5.

We accordingly reverse the district court's denial of Plaintiff's motion for partial summary judgment as to Defendants' affirmative defense of third-party fault. We do not disturb the district court's judgment regarding Defendants' affirmative defense of sudden emergency.

### V.     *Van Winkle's motion to amend his prior motion* in limine *to exclude Defendants' surveillance evidence*

Finally, Van Winkle appeals the district court's denial of his motion to exclude video surveillance evidence. Defendants conducted the surveillance five months after the discovery deadline and did not disclose the video until seven months after the discovery deadline and one month before trial. As the district court ruled, though, the parties agreed to the timing of this disclosure by opting into the procedures of the Lafayette Division of the Western District. The district court concluded, "[t]he parties in this matter 'agree[d] to opt into the former procedure for surveillance evidence'" and, "[t]herefore, Defendants were not required to disclose surveillance evidence prior to the discovery deadline set forth in the governing scheduling order."

The district court's former procedure for surveillance evidence permits the disclosure of surveillance evidence "21 days before [the] pretrial conference." Van Winkle asserts these procedures "conflict[] with this court's holding that surveillance is substantive, not impeachment, evidence," citing *Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 517 (5th Cir. 1993). The *Chiasson* court, however, held that the particular surveillance

in that case was substantive rather than impeachment evidence, not that *all* surveillance is substantive evidence. *Id.* at 517–18. Van Winkle offers no explanation as to how Defendants' surveillance is substantive evidence. More importantly, in *Chiasson*, the court took issue with the fact that the surveillance was not disclosed until trial was underway and that the district court did not allow the plaintiff to view the surveillance videotape before it was played to the jury. *Id.* at 514, 517. In contrast, Defendants here disclosed the surveillance a month before trial, so Van Winkle had notice. Accordingly, *Chiasson* does not assist Van Winkle. The district court did not abuse its discretion in rejecting his argument that the surveillance was untimely.

Van Winkle's second argument has merit. The district court's one-paragraph order did not analyze his alternative argument that the surveillance footage was unfairly prejudicial and misleading under Federal Rule of Evidence 403. Van Winkle avers the district court's ruling unfairly prevents him from challenging the substance of the surveillance evidence before trial under Rule 403. We agree and remand for the district court to conduct the Rule 403 analysis.

Judgment for Defendants is REVERSED and REMANDED in part and AFFIRMED in part.