# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 28, 2025

Lyle W. Cayce
Clerk

————————

No. 24-40058

————————

Lawrence Dike,

*Plaintiff—Appellant*,

*versus*

Columbia Hospital Corporation of Bay Area, *doing business as* Corpus Christi Medical Center; Bay Area Healthcare Group Limited, *doing business as* Corpus Christi Medical Center; HCA Healthcare, Incorporated,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:21-CV-308

———————————————————————

Before Davis, Graves, and Wilson[†], *Circuit Judges*.

Per Curiam:[*]

———————————————

[†] Judge Wilson concurs only in the judgment as to the disposition of Appellant's hostile-work-environment claim, discussed in Part II.C.

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-40058

Plaintiff-Appellant Lawrence "Oscar" Dike[1] appeals a summary judgment that dismissed claims against his former employer, Defendant-Appellants Columbia Hospital Corporation of Bay Area (Individually and d/b/a Corpus Christi Medical Center) and Bay Area Healthcare Group, Ltd. (Individually and d/b/a Corpus Christi Medical Center) (collectively, CCMC), under Title VII and 42 U.S.C. § 1981. We AFFIRM summary judgment on Dike's discrimination and retaliation claims under Title VII and all claims under 42 U.S.C. § 1981. We VACATE summary judgment on Dike's Title VII hostile-work-environment claim and REMAND for proceedings consistent with this opinion.

**I.**

CCMC is a seven-hospital healthcare system with 1,700–2,000 employees. Dike worked its night shift as a certified nursing assistant (CNA) from June 2016 until his March 2018 termination. As a CNA, Dike held the most "junior" position in patient care and took direction from nurses on his shifts. He was the only Black CNA on staff.

Dike completed a 90-day probationary period after his June 27, 2016 hire and, at its conclusion, received a satisfactory performance evaluation. In the ensuing months, Dike's supervisor, Esther Zamora, informally counseled Dike, first about timekeeping,[2] then about professionalism given co-worker concern about Dike's demeanor around, and diligence caring for, patients.[3]

---

[1] Pronounced "dee-kay."

[2] CCMC's policy states "[e]mployees should clock in no sooner than 7 minutes prior to the start of their shift, and clock out no later than 7 minutes after their shift ends." Dike regularly clocked out late or failed to clock out for lunch without justification for the overtime, despite Zamora's informal counseling.

[3] For example, in October 2016, a staff member alerted Zamora and Sewell to a concern expressed by a personal friend who stayed the night with a hospitalized family member. The friend reported Dike "was very inappropriate and was 'hitting' on her and

No. 24-40058

Beginning in 2017, Zamora escalated her disciplinary measures, first memorializing a verbal warning about Dike's persistent timekeeping issues, followed by two written warnings about unprofessional behavior with a patient and with a co-worker who complained Dike had been uncooperative and disrespectful on more than one occasion. While the record reflects other co-workers complained about Dike for a variety of reasons—unprofessional behavior, aggressive demeanor, sleeping on duty, and disappearing during shifts—no further discipline was formally entered until September 2017, when Zamora's supervisor, Jason Sewell, issued a final written warning for insubordinate and unprofessional behavior.[4] After that final warning, Dike took medical leave to recover from a car accident.

Dike returned to work in January 2018 primarily in a different unit at CCMC. It was there that a co-worker complained Dike disappeared during a February 2018 shift. That complaint prompted Sewell and Vince Goodwine,

_____

made her uncomfortable." Zamora's handwritten notes reflect a coaching session and follow-up with Dike: "Stated he is very upset that she misperceived his intentions. It is in his culture that he is very friendly and touchy/feely. It really bothered him that this individual felt uncomfortable. . . . Informed Oscar to be aware of misperceptions + to use caution when carrying on such conversations due to potential misperceptions. He verbalized understanding." At deposition, Dike denied the incident.

[4] CCMC's disciplinary record states: "On multiple occasions Oscar has received coaching and direction about his communication and interaction with coworkers and patients. His demeanor is oftentimes confrontational and aggressive. Despite the coaching's and initiation and progression through the disciplinary process these behaviors continue. 2 recent occurrences, August 6th on the 4th floor and September 9th on the 3rd floor. In both incidences, Oscar's demeanor to staff was aggressive and confrontational as witnessed by several staff members. This behavior has continued despite previous discussions and formal counseling; as a result, this will serve as a final written warning for Oscar." Dike responded in writing, "I stand to tell you my director that the conspiracy is false about me being confrontational and aggressive. . . . My reason of being written up now from all indication was the fact that I reported on patient safety and a nurse abandoning his [patient] . . ."

CCMC's Vice President of Human Resources, to interview employees and pull surveillance footage to ascertain Dike's location during the reported absence. Footage showed Dike left the hospital around 3:00 a.m., walked to an attached medical-office building, and entered a chapel there, where he remained for about 90 minutes.

After the investigation, Goodwine met with Dike, Sewell, and a union representative to ask Dike for a response. Dike offered no explanation for his absence, so Goodwine recommended dismissal to CCMC's Chief Nursing Officer, Kathleen Rubano. She agreed. Dike's last day with CCMC was March 30, 2018.

In Dike's view, the formal discipline, co-worker criticism, and termination constituted retaliation for complaints he'd made to Zamora, Sewell, and Goodwine during his employ—some of which he documented while at CCMC; some of which he testified to during litigation. The most striking of these is testimony that, starting in August 2016, nurses routinely switched Dike's work assignments to placate patients' racial preferences in caregivers. Dike testified he complained to Zamora each time it happened, with the understanding Zamora would relay his complaints to Sewell. Zamora, however, did not remediate the behavior and responded only that Dike should "kill them [the nurses] with smile" and "[w]e make it happen for the patient." For her part, Zamora did not recall these complaints or her purported responses; nor was she aware of a CCMC policy addressing patient racial preferences. She agreed, however, that Dike generally complained to her verbally rather than in writing.

Later, in a June 2017 e-mail to Sewell and Goodwine, Dike complained of a race-based assignment reportedly at the behest of another CNA, Kevin Hernandez. Sewell responded he had "no way . . . to personally investigate and address the issue" because the patient was discharged before Dike

complained. Sewell testified he explained to Dike: "[W]e try to make, you know, accommodations for, you know, patients. You . . . don't want to put the employee in a situation where . . . they're . . . caring for somebody who's . . . got . . . some kind of bias like that. . . . I mean, we want to make sure the patients have a voice."

Dike raised race-based work assignments in two subsequent e-mails to Sewell and Goodwine in the summer of 2017. While the two investigated other complaints Dike raised about his work environment, they did not speak with patients to confirm Dike's allegation of racial preferences; nor did Sewell recall asking employees if they'd experienced patient racial preferences as Dike charged. Sewell, moreover, explained that CCMC had no formal policy for handling race-based patient demands but:

> Generally speaking, if a patient were to request an assignment change due to race, that suggests a racial bias on the part of that patient that we wouldn't want to subject our staff member to, so if we had someone available who could switch, we would likely go ahead and make the change. CCMC has no policy or practice of making patient assignments based on race, and we would only evaluate requests for assignment changes like the one Oscar was complaining of on a case-by-case basis. In my experience, it is very rare for such requests to be made. I am only aware of one time where we changed a patient assignment for racially related reasons and it was because a patient had reportedly used the n-word with respect to Oscar. I believed that changing the patient assignment in that situation was the appropriate outcome because the patient was being racially abusive.

Goodwine confirmed Sewell's statement.

In addition to race-based work assignments, Dike also offered testimony that a patient called him the n-word in February 2017, which he reported to Zamora and his charge nurse, who removed him from the

assignment. Dike disagreed and believed CCMC should have "let the patient know that we don't assign caregivers on the grounds of race. If you don't want someone that's not black to take care of you you're welcome to leave the hospital." Dike testified this happened again in March 2017, but the patient was discharged before anyone could speak with her. Zamora did not recall the incident and testified she "would have remembered that or documented it."

Dike began documenting his complaints in the spring and summer of 2017 and banded together with a co-worker of Ghanaian descent, who complained about a nurse's comments that Black nurses "play the race card"; that a Black nurse "upgraded his skin color" by marrying a Filipino; and that African food "stinks"—statements Dike testified he heard "all the time." Dike also reported in writing that Hernandez ordered him to maintain a twelve-foot distance because Hernandez "don't deal with people of [Dike's] culture, kind of culture, but he don't deal with people like [Dike]." Zamora ordered Hernandez to apologize, and Sewell told Hernandez his demand was unreasonable given patient-care needs. Hernandez's behavior, however, "never stopped" and, in Dike's telling, Sewell then tapped Hernandez to spy on Dike to catch him sleeping at work. After Dike confronted Hernandez about the eavesdropping, multiple staff members accused Dike of striking a patient, an allegation the patient refuted.

Over that summer, Dike lodged at least six written complaints concerning patient-safety issues and recurring interpersonal conflicts with antagonistic co-workers, whose behavior Dike attributed to racial animus. Sewell and Goodwine investigated and counseled at least one employee and

offered Dike a transfer but, otherwise, found no violation of CCMC policy.[5] Dike continued to submit complaints up until his termination in 2018.[6]

He also filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) in December 2017 where he recounted Hernandez's twelve-foot edict, race-based work assignments in June and September 2017, co-worker harassment, and the unfounded accusation that Dike struck a patient in July 2017. He amended the charge after his dismissal to allege disparate treatment in coverage for lunch breaks after his return to work in January 2018. He sued CCMC in December 2021 alleging discrimination and hostile work environment due to race, color, and national origin and retaliation under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, as well as violation of his right to make and enforce contracts under § 1981. CCMC sought summary judgment, which the district court granted and dismissed all Dike's claims with prejudice. This appeal followed.

## II.

Jurisdiction exists under 28 U.S.C. § 1291; our review is de novo though we review "evidentiary rulings that determine the summary judgment record for abuse of discretion."[7] Summary judgment is proper

---

[5] Dike "seriously consider[ed]" the transfer but declined. "I cannot embolden the abusers to continue their errant ways to believe and know all they had to do is to band together, unfairly pick on a victim due to the person's skin color or other trite and non-professionally related consideration and v[oi]la! that person will resign, be terminated or will be made to voluntarily transferred."

[6] Shortly before his dismissal, Dike produced photographs of nurses asleep while on duty, complained that a high-fall-risk patient was injured because her assigned nurse was asleep, and threatened to report CCMC to the Texas Board of Nursing. CCMC offered evidence that it disciplined five staff members for sleeping during their shifts after Dike complained.

[7] *Patel v. Tex. Tech Univ.*, 941 F.3d 743, 746 (5th Cir. 2019); *see also Windermere Oaks Water Supply Corp. v. Allied World Specialty Ins. Co.*, 67 F.4th 672, 674 (5th Cir. 2023).

where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[8] When assessing whether a genuine dispute exists, we consider all the evidence in the record and draw all reasonable inferences in the nonmoving party's favor, while refraining from credibility determinations or weighing the evidence.[9]

We conclude summary judgment was proper except as to Dike's claim of hostile work environment. There, the district court excluded key evidence and misapprehended the law, which in turn distorted the record and obscured questions of fact that would militate against summary judgment. We address the claims seriatim.

**A.**

The district court assessed summary judgment of Dike's Title VII and § 1981 discrimination claims under the burden-shifting framework of *McDonnell Douglas Corporation v. Green*.[10] Under that framework, an employee intending to prove discrimination with circumstantial—as opposed to direct—evidence must prove a prima facie case that he: (1) belongs to a protected class; (2) is qualified for the position at issue; (3) was subject to an adverse employment action; and (4) was "similarly situated" to other employees outside of his class who "were treated more favorably."[11] If

---

[8] Fed. R. Civ. P. 56(a).

[9] *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007); *Van Winkle v. Rogers*, 82 F.4th 370, 381 (5th Cir. 2023) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (internal quotation marks omitted).

[10] 411 U.S. 792, 802 (1973); *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1284 n.7 (5th Cir. 1994) (noting elements of Title VII and § 1981 are identical).

[11] *West v. City of Houston*, 960 F.3d 736, 740 (5th Cir. 2020) (internal quotation marks omitted).

the employee succeeds, the burden then shifts to his employer to produce a legitimate, non-discriminatory reason for its action.[12] The employer's burden is one of mere production and, once satisfied, the presumption of discrimination "falls away and the factual inquiry becomes more specific."[13] At this stage, the employee must prove his employer's proffered reason was not its real reason but pretext for discrimination.[14]

Dike's discrimination claim involves four fact patterns: (1) disparate coverage for lunch breaks upon his return to work in January 2018; (2) co-worker hostility and exclusion; (3) the referral of one of his complaints to Vince Goodwine for resolution; and (4) Hernandez's twelve-foot decree. None warrants a jury trial. As to the lunch-coverage matter, the district court excluded Dike's sole evidence as hearsay in a ruling Dike has not challenged on appeal.[15] His second and third scenarios concerning co-worker hostility and the complaint referral fail the third and fourth factors of the *McDonnell Douglas* framework: Neither presents an "adverse employment action" even under the nominal definition the Supreme Court recently established; nor does the record contain evidence of "similarly situated" non-Black CNAs

---

[12] *Hager v. Brinker Tex., Inc.*, 102 F.4th 692, 699 (5th Cir. 2024).

[13] *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004).

[14] *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 457 (5th Cir. 2019) ("A plaintiff can do so by showing that: (1) a discriminatory reason more likely motivated the employer, (2) the employer's reason is unworthy of credence, or (3) he is clearly better qualified than the person selected for the position[.]") (internal citations and quotation marks omitted).

[15] *Brinkmann v. Dall. Cnty. Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987) (holding appellant's failure to identify error in the basis for the district court's judgment "is the same as if he had not appealed that judgment").

treated more favorably than he in these respects.[16] As to Hernandez's twelve-foot rule, the record supports a conclusion that Hernandez harbored discriminatory animus toward Dike. But Hernandez's animus isn't attributable to CCMC without something more, such as Hernandez's control over a decisionmaker, which the record does not support.[17] Summary judgment was justified given Dike's failure of proof on these factors. Dike also failed to show the reasons for CCMC's actions during his employment were pretext for discrimination.

## B.

Dike's evidence of retaliation under Title VII and § 1981 likewise falls short. Barring direct evidence of retaliation, *McDonnell Douglas*'s burden-shifting framework requires an employee prove (1) his participation in a protected activity; (2) the employer took an adverse employment action against him; and (3) a causal connection between the protected activity and the adverse action.[18] The burden then shifts to the employer to produce a legitimate, non-retaliatory reason for the adverse employment action.[19] If the employer produces a reason, then the employee must respond with evidence showing the reason was pretext for retaliation and "a conflict in substantial

---

[16] *See Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346, 354–55 (2024); *Perez v. Tex. Dep't of Crim. Just., Institutional Div.*, 395 F.3d 206, 213 (5th Cir. 2004) (discussing *McDonnell Douglas* comparator requirement).

[17] *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226–27 (5th Cir. 2000); *Auguster v. Vermilion Par. Sch. Bd.*, 249 F.3d 400, 405 (5th Cir. 2001). Whether CCMC properly remediated Hernandez's twelve-foot rule is a matter for the district court on remand. *See infra*, Part II.C.

[18] *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 835 (5th Cir. 2022).

[19] *Long v. Eastfield Coll.*, 88 F.3d 300, 304–05 (5th Cir. 1996).

evidence on the question of whether the employer would not have taken the adverse employment action but for the protected activity." [20]

Dike contends CCMC's discipline and ultimate termination were all retaliatory. Consistent with *McDonnell Douglas*, CCMC produced legitimate, non-retaliatory reasons for each as explained above. In response, Dike did not offer evidence that CCMC's reasons were false but instead argued a jury *could* find CCMC's reasons pretextual coupled with subjective assertions of innocence. None creates a fact issue. Dike otherwise failed to show the strong grounds CCMC gave for his discipline and termination were pretext for retaliation (or for discrimination), warranting summary judgment on the retaliation claim. [21]

## C.

That leaves Dike's hostile-work-environment claim under Title VII. [22] To overcome summary judgment, an employee must show he belongs to a protected group; he was subjected to unwelcome harassment; the harassment complained of was based on race, color, or national origin; the harassment affected a term, condition, or privilege of employment; and the employer knew or should have known of the harassment in question and failed to take prompt remedial action. [23] "What constitutes prompt remedial

---

[20] *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577 (5th Cir. 2020), *as rev'd* (Aug. 14, 2020) (internal citation and quotation marks omitted); *Auguster*, 249 F.3d at 403.

[21] *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007); *Evans v. City of Houston*, 246 F.3d 344, 355 (5th Cir. 2001).

[22] We analyze Dike's hostile-work-environment claim under Title VII because his corresponding claim under § 1981 is time barred. In a ruling unchallenged on appeal, the district court held any pre-December 23, 2017 conduct could not form the basis for Dike's § 1981 claim given the four-year limitations period of 28 U.S.C. § 1658. Dike's hostile-work-environment claim relies exclusively on events predating December 23, 2017.

[23] *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002).

action is a fact-specific inquiry and not every response by an employer will be sufficient to absolve the employer of liability under Title VII."[24]

Not all harassment is actionable; rather, only that which is objectively *and* subjectively offensive and so severe *or* pervasive as to alter the terms and conditions of employment may give rise to a claim.[25] This "requires an examination of all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[26]

The series of separate acts Dike offered in support of this claim includes (1) biweekly race-based work assignments starting in August 2016; (2) reassignments after two patients used racial slurs with Dike; (3) race-based work assignment by Hernandez; (4) derogatory comments about African food; (5) repeated statements that a Black nurse "upgraded his status by marrying a Filipino;" (6) co-worker mockery of Dike's accent; (7) Hernandez's demand that Dike stay twelve feet away from him because of Dike's color and culture; (8) Zamora's inaction; (9) the unsubstantiated accusation that Dike struck a patient; (10) Sewell's deference to patient racial

---

[24] *Williams-Boldware v. Denton County*, 741 F.3d 635, 640 (5th Cir. 2014) (internal quotation marks omitted).

[25] *Bye v. MGM Resorts Int'l, Inc.*, 49 F.4th 918, 924 (5th Cir. 2022). On appeal, Dike argues that *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346 (2024), changed the severe-or-pervasive test for hostile-work-environment claims, but he fails to explain the reasoning for his argument and, as one district court has noted, "The Supreme Court has defined the requirements of a hostile work environment claim over the course of many years, making clear the high bar that plaintiffs must meet to make out this claim. There is no suggestion in *Muldrow* that the Supreme Court intended to alter these requirements." *Zuniga v. City of Dallas*, No. 23-2308, 2024 WL 2734956, at *3 n.3 (N.D. Tex. May 28, 2024) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (internal citation omitted).

[26] *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 103 (2002).

preferences in spite of no hospital policy on point; (11) insufficient investigations into and responses to Dike's complaints; and (12) antagonistic co-workers. The district court concluded "the 'harassment' about which Dike complained was either unsubstantiated, not related to his race/color/national origin, or otherwise not sufficiently severe and pervasive to support a hostile work environment claim."[27] We disagree with five aspects of the analysis the court employed in arriving at this conclusion.

First, the district court excluded Dike's deposition testimony about race-based work assignments as "self-serving." Like any other evidence, however, self-serving testimony is admissible on summary judgment and need only comport with the standard requirements of Rule 56.[28] So long as those requirements are met, self-serving testimony—including Dike's— "may create fact issues even if not supported by the rest of the record."[29] On

_____

[27] Appearing as amicus, the EEOC argued the district court required that Dike prove the harassment he encountered was "severe *and* pervasive" as opposed to "severe *or* pervasive." The district court's opinion phrases the test in the disjunctive save one instance, which appears to be scrivener's error. On remand, the district court should assess the offensiveness of the complained-of harassment under the severe-*or*-pervasive standard. *See Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 435 (5th Cir. 2005) ("[T]he requirement that a plaintiff establish that reported abusive conduct be both severe and pervasive in order to be actionable imposes a more stringent burden on the plaintiff than required by law.").

[28] *Guzman v. Allstate Assur. Co.*, 18 F.4th 157, 160–61 (5th Cir. 2021) ("How much weight to credit self-interested evidence is a question of credibility, which judges may not evaluate at the summary judgment stage."); *see also Patel v. Tex. Tech Univ.*, 941 F.3d 743, 746 (5th Cir. 2019) ("Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . , the material may be presented in a form that would not, in itself, be admissible at trial.").

[29] *Guzman*, 18 F.4th at 160.

remand, the district court should reevaluate this claim with the benefit of Dike's testimony.[30]

Second, rather than assess the cumulative effect of events Dike raised, the district court considered each singly and found none sufficiently severe or pervasive to overcome summary judgment. As a result of this approach, the court failed to assess the totality of the circumstances and ended up rejecting relevant evidence such as "second-hand harassment"—harassment directed at other employees, which Dike testified he witnessed. In excluding second-hand harassment, the court cited our unpublished opinion in *Frazier v. Sabine River Authority Louisiana* for the proposition that "[t]he Fifth Circuit has held that second-hand harassment is insufficient to constitute a hostile work environment."[31] But *Frazier* does not establish a per se rule excluding all second-hand harassment. Rather, second-hand harassment is but one part of the totality of the circumstances to be considered when deciding a claim such as this.[32] On remand, the district

---

[30] CCMC argues for the first time on appeal that Dike's testimony of race-based work assignments constitutes double hearsay—testimony of what nurses said to Dike about what patients said to them. On remand, the district court should consider whether the nurses' statements to Dike about his work assignments are hearsay or if they are non-hearsay statements "on a matter within the scope of" the nurses' employment relationship with CCMC. *See* FED. R. EVID. 801(d)(2)(D). It should also assess whether Dike offered the patient statements to the nurses for their truth. *See* FED. R. EVID. 801(c)(2). While best decided by the district court in the first instance, we're not convinced he did: Either the nurses faithfully reported patients' racial preferences (and switched Dike's assignments based on his race) or the nurses fabricated the statements altogether (and switched Dike's assignments based on his race). Regardless of the "truth" of the patients' statements, the result from Dike's perspective was the same—work assignments based on his race.

[31] 509 F. App'x 370 (5th Cir. 2013) (per curiam).

[32] *Id*. at 374–75.

court should reassess the totality of the circumstances presented rather than evaluate piecemeal the claim's component parts.

Third, the district court did not consider Dike's testimony about co-worker mockery because it did not specifically recount the incidents in his operative complaint or EEOC Charge of Discrimination. For this ruling, the court relied on *Cutrera v. Board of Supervisors of Louisiana State University*, which held a claim must first be asserted in a complaint and not in response to a summary-judgment motion.[33] *Cutrera* is inapt because Dike did not add a claim in response to CCMC's summary judgment. Rather, he stated a claim for hostile work environment in his operative petition then offered evidence of that claim on summary judgment, which is proper as a general matter.[34] As to any divergence between Dike's summary-judgment evidence and his EEOC charge, charges are oftentimes drafted by lay people without assistance from counsel.[35] To accommodate this, a "Title VII lawsuit may include allegations 'like or related to allegation[s] contained in the [EEOC] charge and growing out of such allegations during the pendency of the case before the Commission.'"[36] On remand, the district court should determine whether evidence Dike offered on summary judgment could "reasonably be

---

[33] 429 F.3d 108, 113 (5th Cir. 2005).

[34] *Guenther v. BP Ret. Accumulation Plan*, 50 F.4th 536, 544 (5th Cir. 2022) (per curiam) ("It is unnecessary for a complaint to allege every fact or theory that is conceivably relevant so that a plaintiff may ultimately obtain relief.").

[35] *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465 (5th Cir. 1970) ("[T]he specific words of the charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow."); *see also Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 402–03 (2008).

[36] *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 273 (5th Cir. 2008).

expected to grow out of" an investigation of his EEOC charge.[37] If so, the court should include the additive effect of the evidence when assessing the totality of the circumstances.

Fourth, by discounting Dike's "self-serving" testimony, the district court did not consider Dike's statements denying CCMC's claim that it remediated all of Dike's complaints of co-worker harassment.[38] It also overlooked agreement in the record that Dike's supervisors at CCMC did not remediate race-based work assignments but generally complied with expressed patient preferences.

Fifth, the district court distinguished Dike's case from *Chaney v. Plainfield Healthcare Center*, a Seventh Circuit case that pitted "a health-care worker's right to a non-discriminatory workplace against a patient's demand for white-only health-care providers."[39] *Chaney* is one in a line of cases denying an employer the right to defer to discriminatory customer preferences.[40] The basis for the district court's distinction—that CCMC had

---

[37] *Sanchez*, 431 F.2d at 466 (holding scope of complaint "limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."); *Fellows v. Universal Rests., Inc.*, 701 F.2d 447, 450–51 (5th Cir. 1983).

[38] *Williams-Boldware v. Denton County*, 741 F.3d 635, 641 (5th Cir. 2014) ("[I]n determining whether the employer's actions were remedial, we have considered whether the offending behavior in fact ceased.") (internal quotation marks omitted); *see also Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 914–15 (7th Cir. 2010) (identifying ways nursing home could have remediated racial preferences of residents at residential-care facility).

[39] *Chaney*, 612 F.3d at 910. The EEOC filed an amicus brief urging that summary judgment be vacated and remanded on this claim, citing *Chaney*.

[40] *See* 42 U.S.C. § 2000e-2(e)(1) (establishing bona fide occupational qualifications but excluding race and color as grounds for that defense); *Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 289 (5th Cir. 1971) (rejecting practice of hiring only women as flight attendants); *Hamilton v. Dallas County*, 79 F.4th 494, 509 (5th Cir. 2023) (Ho, J., concurring) (noting Justice Department agreement that "work assignments . . . happening on the basis of race" are actionable under Title VII); *Johnson v. Maestri-Murrell Prop. Mgmt., LLC*, 487 F. App'x 134 (5th Cir. 2012) (per curiam) (holding refusal to interview

no formal policy embracing race-based work assignments, whereas the residential-care facility in *Chaney* did—is suspect since, according to Dike's evidence, the practice was allowed to continue and his supervisors at deposition agreed they'd defer to patients' racial preferences. A factfinder should be allowed to decide whether testimony from Dike and his supervisors establish an informal policy of deferring to patient wishes in this respect.

### III.

When Dike's testimony is considered in light of all the evidence presented, we're satisfied that questions of fact are present on the hostile-work-environment claim. Accordingly, we AFFIRM summary judgment on Dike's Title VII discrimination and retaliation claims and all § 1981 claims, VACATE summary judgment on Dike's Title VII hostile-work-environment claim, and REMAND for proceedings consistent with this opinion.

---

Black candidate because LSU parents would not want a Black property manager was "direct evidence of racial discrimination").